UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**TWIN RIVERS ENGINEERING CORPORATION,**

        Plaintiff,

v.                                                    Case No: 6:12-cv-1794-Orl-36TBS

**FIELDPIECE INSTRUMENTS, INC.,**

        Defendant.

## ORDER

This cause comes before the Court on Plaintiff Twin Rivers Engineering Corporation's ("TRE") Pre-Trial Motion in Limine, or in the Alternative, Motion to Strike Defendant Fieldpiece Instruments, Inc.'s ("Fieldpiece") Counterclaims ("Motion to Strike") (Doc. 99). Fieldpiece filed a response in opposition to the Motion to Strike ("Response") (Doc. 100). For the reasons that follow, the Motion to Strike will be denied.

**I.    BACKGROUND[1]**

    **A.    The Business Agreement and the Automotive Mold Agreement**

On September 14, 2004 and April 4, 2006, respectively, TRE obtained patents relating to an infrared leak detector (the "'993 Patent" and the "'088 Patent") from the United States Patent and Trademark Office. Doc. 59, Stipulation of Agreed Material Facts ("SAF") ¶¶ 1–4. On April 16, 2006, TRE and Fieldpiece entered into a written agreement (the "Business Agreement") whereby TRE granted Fieldpiece an exclusive license to sell products covered by the '993 Patent and the '088 Patent (the "Patented Technology") in the heating, ventilation, air conditioning, and

---

[1] This Order assumes some familiarity with the underlying facts of the case. *See* Doc. 103.

refrigeration ("HVAC/R") market. Doc. 59-1, Business Agreement § 2(g). The Business Agreement further provided that TRE would "exclusively supply to Fieldpiece or Fieldpiece's supplier in quantities ordered by Fieldpiece or its supplier to meet its market requirements a custom integrated circuit ["Integrated Circuit"] suitable for use in a hand held leak detector at a reasonable mutually agreeable price." *Id.* § 2(h).

In addition to the provisions regarding sales by Fieldpiece in the HVAC/R market, the Business Agreement contains language addressing the possibility of TRE selling infrared leak detectors in the automotive market. *Id.* §§ 1(d), 2(d)–(f), 2(i)–(j). Under the Business Agreement, if TRE made a decision to enter this market, TRE would sell the infrared leak detectors exclusively through Fieldpiece or, alternatively, Fieldpiece would serve as TRE's supplier and TRE would sell the detectors on its own. *Id.* § 2(d). Fieldpiece agreed to "support TRE's efforts in the automotive market" by performing certain other agreed-upon commercial functions. *Id.* §§ 2(i)–(j). TRE alleges that, based on these terms, the parties thereafter entered into a separate oral agreement (the "Automotive Mold Agreement") whereby Fieldpiece agreed to supply TRE with automotive molds that would house infrared leak detectors sold by TRE in the automotive market, and that Fieldpiece did indeed supply TRE with the automotive molds for six years. Doc. 38 ¶ 22–23.

**B.     The Inficon Settlement Agreement**

On December 7, 2006, TRE filed suit against a third party, INFICON, Inc. ("Inficon"), alleging that Inficon was infringing both the '088 and '993 Patents. Doc. 77-1 at 19. On October 22, 2009, TRE and Inficon entered into a settlement agreement (the "Inficon Settlement Agreement") whereby, among other things, TRE covenanted not to sue Inficon, its affiliates, or its customers "for infringement of any patents based upon any infrared gas analyzers or leak detectors, including, but not limited to, D-TEK brand products." *Id.* at 20–21. After settling with Inficon, TRE's president, Bill Williams, sent an email to the president of Fieldpiece, Rey Harju, stating:

> The Patent Law suit against Inficon has been settled, we retained our Patents!! This will keep all interlopers out of the infrared product business.
>
> Inficon will continue selling their product through Tracer, there [sic] list price is $ 565.00 WOW, I don't think that's much competition.

Doc. 82-1 at 3–4. The email did not mention that TRE had granted Inficon a covenant-not-to-sue. *See id.*

### C. The Instant Action

In 2012, Fieldpiece became aware that another company, SPX Service Solutions ("SPX"), via a holding company called APO ("APO"), was selling leak detectors utilizing TRE's Patented Technology in the HVAC/R market, in violation of the provisions of the Business Agreement granting Fieldpiece the exclusive right to sell the Patented Technology in this market. Doc. 16, Ex., Affidavit of Rey Harju ("Harju Aff.") ¶ 11. TRE, however, asserts that this was the result of a unilateral action by the manufacturer of the leak detectors, CHY Firemate Co., Ltd. ("CHY"), to fill orders to companies other than Fieldpiece. Doc. 21, Ex. A., Affidavit of William Williams ¶¶ 14, 24–28. TRE claims that it immediately informed CHY that it was not allowed to fill any orders for TRE's Patented Technology placed by SPX or APO, but Fieldpiece insists that TRE refused to take action to prevent the unauthorized sales from continuing. *Id.* ¶¶ 29–30; Harju Aff. ¶ 12. Consequently, on October 11, 2012, Fieldpiece notified TRE that TRE was no longer authorized to order products using the automotive mold. SAF ¶ 13; Harju Aff. ¶ 13.

On November 27, 2012, counsel for TRE sent Fieldpiece a letter stating that "[t]o the extent the Business Agreement . . . is valid," TRE was terminating the Business Agreement, effective the following day. SAF ¶ 9; Doc. 38-1, Ex. 2. The same day it sent the letter, TRE filed a Complaint in this Court asserting claims for breach of the Automotive Mold Agreement and fraudulent misrepresentation because Fieldpiece had "unilaterally and unjustifiably" stopped providing TRE with access to the automotive molds. Doc. 1. Shortly thereafter, TRE filed an Amended

3

Complaint, this time adding a claim for a declaratory judgment providing that the Business Agreement had been terminated. Doc. 5.

On January 10, 2013, in response to an inquiry from Fieldpiece's counsel regarding the relationship between TRE and Inficon, and despite the existence of the Inficon Settlement Agreement, counsel for TRE sent an email to Fieldpiece's counsel stating:

> I spoke with my client regarding Inficon. There are no agreements, including a license agreement, between my client and Inficon. Inficon is not, and has not, sold any of my clients product. My client does not receive any money from Inficon. What Inficon sells does not come from my client. Hopefully that clears up that point with your client.

Doc. 101-1.

On March 8, 2013, TRE filed its Second Amended Complaint—TRE's operative pleading in this case—asserting separate claims for breach of the Business Agreement and breach of the Automotive Mold Agreement arising from Fieldpiece's failure to provide the automotive molds. Doc. 38 ¶¶ 32–49. TRE also sought a declaratory judgment stating that the Business Agreement had been terminated. *Id.* ¶¶ 50–61.

On March 15, 2013, Fieldpiece served upon TRE its required initial disclosures under Rule 26 ("Initial Disclosure Statement"). Doc. 99, Ex. 1. As to damages, Fieldpiece's Initial Disclosure Statement provided:

> Currently, Fieldpiece is unable to completely and fully identify and compute its damages due to the incalculable loss of market share Fieldpiece would suffer should TRE be allowed to unilaterally and unlawfully terminate the parties [Business] Agreement. Fieldpiece will attempt to supply said information at the conclusion of this matter should it be necessary.

*Id.* at 4.

On March 22, 2013, Fieldpiece filed a counterclaim alleging that TRE had breached the Business Agreement "by unilaterally and unjustifiably terminating the Business Agreement and thereafter refusing to supply the integrated circuits to Fieldpiece." Doc. 43 at 11. Then, on April

4

30, 2013, with leave of court, *see* Doc. 49, Fieldpiece filed an amended answer and counterclaims, which remain pending in part. Doc. 51. Specifically, Fieldpiece asserts a counterclaim for breach of contract, alleging that TRE breached the Business Agreement by (1) unilaterally terminating it and thereafter refusing to supply the Integrated Circuits to Fieldpiece, and (2) supplying the Patented Technology to third parties in violation of Fieldpiece's exclusive right to sell the Patented Technology in the HVAC/R market. *Id.* at 11–12. Fieldpiece also asserts a counterclaim under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, alleging that TRE engaged in deceptive and unfair trade practices by supplying the Patented Technology to Fieldpiece's competitors despite granting Fieldpiece the exclusive right thereto. *Id.* at 12.

Shortly before filing its amended counterclaims, on April 20, 2013, Fieldpiece served TRE with its First Request for Production of Documents pursuant to Rule 34, which included a request for "[a]ny and all licenses or settlement agreements relating to the use of the Patented Technology." Doc. 100 at 4; Doc. 101-2 at 6. On May 20, 2013, TRE served Fieldpiece with its Response to Fieldpiece's First Request for Production of Documents, stating that it "[did] not have any license agreements related to the use of its Patented Technology. [TRE] entered into a settlement agreement with Inficon on October 22, 2009 to settle litigation, to the extent the settlement is not confidential, TRE will produce a copy." Doc. 101-2 at 6. On July 5, 2013, TRE provided Fieldpiece with a copy of the Inficon Settlement Agreement. Doc. 77 ¶ 13.

After receiving a copy of the Inficon Settlement Agreement, on August 5, 2013, Fieldpiece served TRE with its responses to TRE's first set of interrogatories. *See* Doc. 99 at 9–11.[2] In

---

[2] In its Motion to Strike, TRE states that it has attached Fieldpiece's responses to TRE's first set of interrogatories as an exhibit. Doc. 99 at 11. However, no such exhibit is attached to the Motion to Strike. Given that the content of the responses is not disputed, though, the Court cites directly to the quoted portions of the responses in the Motion to Strike.

response to TRE's question as to Fieldpiece's calculation of its damages resulting from TRE's alleged breach of the Business Agreement, Fieldpiece responded:

> [I]nformation related to lost profits is in possession of third parties and is based upon Inficon sales of the D-Tek Select product, in the HVAC, market after the Settlement Agreement with TRE was executed. Fieldpiece estimates its damages to be approximately Eight Million Seven Hundred Thousand Dollars, (8,700,000.00), based upon initial information gathered from large distributors by Fieldpiece, including Inficon's historical sales, multiplied by Fieldpiece's profit margin per leak detector. Fieldpiece intends to subpoena specific sales figures directly from Inficon. Discovery is ongoing and Fieldpiece reserves the right to supplement this response following completion of all discovery.

*Id.* at 10.

Then, on August 12, 2013—approximately four months after the Case Management and Scheduling Order's April 15, 2013 deadline to file a motion to amend pleadings—Fieldpiece filed a motion for leave to further amend its counterclaims to include allegations concerning the covenant-not-to-sue in the Inficon Settlement Agreement. Doc. 77 at 1. Specifically, Fieldpiece sought to allege that the covenant-not-to-sue had the effect of creating a non-exclusive license for Inficon to continue practicing the '088 and '993 Patents, thereby violating Fieldpiece's exclusive right to sell the Patented Technology pursuant to the Business Agreement. *Id.* ¶ 1. Fieldpiece also sought to tailor its damages request to the evidence regarding the Inficon Settlement Agreement. *Id.* ¶ 2.

On September 11, 2013, Magistrate Judge Thomas B. Smith entered an order denying Fieldpiece's motion for leave to amend its counterclaims. Doc. 88. Magistrate Judge Smith found that Fieldpiece did not establish "good cause" to modify the Case Management and Scheduling Order because it had failed to act with due diligence upon its knowledge of the Inficon Settlement Agreement. *Id.* at 6–9. Magistrate Judge Smith also found that TRE would be unduly prejudiced by any amendment because the approaching October 1, 2013 discovery deadline set forth in the

Case Management and Scheduling Order meant that the parties would have less than one month to conduct discovery. *Id.* at 9–10.

On October 1, 2013—the aforementioned discovery deadline—the parties jointly filed a motion to extend the discovery deadline two months due to counsel for TRE giving birth shortly before the deadline. Doc. 92. The same day, Magistrate Judge Smith entered an order granting the motion and providing the parties up to and including December 1, 2013 to complete discovery. Doc. 93.

At a deposition conducted during the extended discovery period, Harju testified that Fieldpiece's counterclaims were based on the covenant-not-to-sue granted to Inficon by TRE in the Inficon Settlement Agreement. Doc. 99, Ex. 3. On November 27, 2013—four days before the extended discovery deadline—Fieldpiece served TRE with its supplemented interrogatory responses, including a supplement to its previous response to TRE's question regarding Fieldpiece's calculation of damages. Doc. 99, Ex. 5 at 6–7. In that supplemented response, Fieldpiece provided greater detail regarding the documents supporting Fieldpiece's calculation of damages. *See id.* Fieldpiece stated that because certain of those documents were voluminous and would be unduly burdensome to produce, they would be made available to TRE for inspection at Fieldpiece's facility pursuant to Federal Rule of Civil Procedure 34(b)(2)(B). *Id.*

On January 21, 2014, TRE filed the instant Motion to Strike, asserting that Fieldpiece's counterclaims should be stricken or, in the alternative, that Fieldpiece should be barred from presenting evidence regarding any of its claims for damages during trial. Doc. 99. TRE contends that the Magistrate Judge's order denying Fieldpiece's motion for leave to amend its counterclaims precludes Fieldpiece from using the Inficon Settlement Agreement's covenant-not-to-sue as a basis

for relief in this case, and that TRE would be prejudiced if Fieldpiece is allowed to pursue its counterclaims because TRE has not had the opportunity to obtain adequate discovery. *Id.*

While the Motion to Strike was pending, the Court entered an order granting TRE summary judgment on its claim for declaratory relief, finding that the Business Agreement had been terminated, at the latest, by TRE's November 27, 2012 letter to Fieldpiece. Doc. 113 at 12. Consequently, the Court dismissed Fieldpiece's counterclaim for breach of contract to the extent it sought to impose liability for actions occurring after the termination of the Business Agreement. *Id.* at 15. However, the Court found that TRE could potentially be liable for supplying its Patented Technology to third parties if that activity occurred *before* the termination of the Business Agreement. *Id.* at 13–14.

## II.   DISCUSSION

TRE offers several reasons for why Fieldpiece's counterclaims should be stricken or, alternatively, why Fieldpiece should be precluded from presenting evidence regarding any of its claims for damages during trial. TRE first argues that the allegations in Fieldpiece's counterclaims do not pertain to the Inficon Settlement Agreement, but rather to TRE supplying SPX with its Patented Technology in violation of the Business Agreement. Doc. 99 at 6–7. However, the Court does not read the allegations so narrowly. The counterclaims, in fact, do not even mention SPX. *See* Doc. 51. Instead, Fieldpiece's counterclaim for breach of contract states that "TRE has supplied its patented technology to third parties in violation of Fieldpiece's exclusive right to sell infrared leak detectors that include TRE's patented technology," while Fieldpiece's counterclaim for deceptive and unfair trade practices similarly asserts that "TRE supplied its patented technology to competitors of Fieldpiece despite granting Fieldpiece the exclusive right thereto." *Id.* at 12. In ruling on TRE's motion to dismiss, the Court held that these allegations were sufficient to state plausible claims for relief to the extent they sought to impose liability for actions occurring

8

before the termination of the Business Agreement. Doc. 113 at 13–14. And one could certainly conclude that, by granting the covenant-not-to-sue to Inficon, TRE violated Fieldpiece's exclusive license to sell infrared leak detectors that included the Patented Technology. *See TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1274–77 (Fed. Cir. 2009) (holding that a settlement agreement containing a covenant-not-to-sue a patent infringer has the effect of "authorizing" or "licensing" sales by the covenantee). Thus, Fieldpiece's counterclaims for breach of contract and deceptive and unfair trade practices are broad enough to include TRE's grant of the covenant-not-to-sue to Inficon.

TRE also argues that the Magistrate Judge's order denying Fieldpiece's motion to amend its counterclaims prohibited Fieldpiece from asserting damages resulting from TRE's grant of the covenant-not-to-sue. Doc. 99 at 7. However, the Magistrate Judge's order did no such thing. Rather, the order denied Fieldpiece the opportunity to amend its counterclaims to more specifically allege that the basis for its counterclaims was the covenant-not-to-sue. *See* Doc. 88. Thus, Fieldpiece's counterclaims remained pending. And, as explained above, those counterclaims can fairly be read as including the allegations regarding the covenant-not-to-sue.

Notwithstanding the sufficiency of these allegations, TRE insists that the Court should assert its authority under Federal Rule of Civil Procedure 37(c) to strike Fieldpiece's counterclaims or, alternatively, preclude Fieldpiece from introducing evidence as to its damages at trial, because Fieldpiece failed to adequately disclose those damages in discovery, as required by Rule 26. Doc. 99 at 8–14. Rule 26(a)(1)(A) requires a party, in its mandatory initial disclosures, to provide the other party with "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is

based, including materials bearing on the nature and extent of injuries suffered." Fed. R. Civ. P. 26(a)(1)(A)(iii). A party must make these initial disclosures "based on the information then reasonably available to it." Fed. R. Civ. P. 26(a)(1)(E). Rule 26(e) requires a party which has made mandatory initial disclosures under Rule 26(a) or which has responded to discovery requests to "supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). If a party fails to provide information required by Rule 26(a) or (e), "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Upon motion of the aggrieved party, the Court may also strike the disobedient party's pleadings or prohibit it "from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Fed. R. Civ. P. 37(c)(1)(C), 37(b)(2)(A)(ii)–(iii).

Here, however, it does not appear that Fieldpiece committed a violation of Rule 26(a) or (e). While Fieldpiece's Initial Disclosure Statement did not include information as to damages resulting from the covenant-not-to-sue in the Inficon Settlement Agreement, *see* Doc. 99, Ex. 1 at 4, this is likely because TRE's counsel had denied that any agreement between TRE and Inficon existed, and therefore Fieldpiece had no knowledge of the covenant-not-to-sue. Thus, Fieldpiece's Initial Disclosure Statement was "based on the information then reasonably available to it," as required by Rule 26(a)(1)(E). Then, after receiving a copy of the Inficon Settlement Agreement, Fieldpiece served its responses to TRE's first set of interrogatories, stating that its damages were due to Inficon's sales of the D-Tek Select product following the execution of the Inficon Settlement

Agreement. Doc. 99 at 10. Fieldpiece stated that the information relating to lost profits was in the possession of Inficon, but it provided an educated estimate of its damages, stated that it would subpoena sales data from Inficon, and noted that it reserved the right to supplement its response as discovery progressed. *Id.* Before the extended discovery deadline, Fieldpiece supplemented its response with more detailed information and stated that TRE could inspect the documents supporting damages at Fieldpiece's facility in accordance with Rule 34(b)(2)(B). Doc. 99, Ex. 5 at 6–7.[3] These responses obviated the need for Fieldpiece to supplement its Initial Disclosure Statement because the information relating to damages had already been made known to TRE. *See* Fed. R. Civ. P. 26(e)(1)(A). And if TRE believed that Fieldpiece's responses were inadequate, it should have filed a motion to compel under Rule 37(a). Accordingly, the Court finds no violation of Rule 26(a) or (e), and, therefore, no basis for sanctions under Rule 37.

Finally, the Court rejects TRE's argument that it will be severely prejudiced if Fieldpiece is permitted to offer evidence regarding the covenant-not-to-sue at trial. *See* Doc. 99 at 7–8, 13. TRE has long known that the Inficon Settlement Agreement might be at issue in this case. Indeed, in January 2013, Fieldpiece's counsel asked TRE's counsel about the relationship between TRE and Inficon, and TRE's counsel denied (incorrectly, it seems) that there was any agreement between Inficon and TRE. *See* Doc. 101-1. Then, in May 2013, in response to a discovery request from Fieldpiece, TRE acknowledged that there was a settlement agreement between Inficon and TRE, and it provided Fieldpiece with a copy of the Inficon Settlement Agreement in July 2013. Doc. 101-2 at 6; Doc. 77 ¶ 13. After receiving a copy of the Inficon Settlement Agreement, Fieldpiece served TRE with its responses to TRE's first set of interrogatories, in which Fieldpiece

---

[3] Contrary to TRE's argument, the Magistrate Judge's order extending the discovery deadline did not limit the parties to merely conducting depositions; rather, it stated that the parties "shall have through December 1, 2013 to complete discovery in this matter." Doc. 93.

stated that it was seeking damages for lost profits based upon Inficon's sales of infrared leak detectors following the execution of the Inficon Settlement Agreement. Doc. 99 at 10. In November 2013, Fieldpiece supplemented its responses to more specifically identify these damages. Doc. 99, Ex. 5 at 6–7. Because the Inficon Settlement Agreement has been the subject of discovery for some time in this case, TRE cannot now claim that it would be prejudiced by Fieldpiece's presentation of evidence regarding the covenant-not-to-sue. Moreover, to the extent that TRE suffered prejudice by not pursuing discovery on Fieldpiece's counterclaims based on its interpretation of the Magistrate Judge's order, any prejudice can be cured by allowing TRE to review the documents at issue. Therefore, the Court will grant TRE twenty days within which to review the documents.

Accordingly, it is hereby **ORDERED**:

1. TRE's Pre-Trial Motion in Limine, or in the Alternative, Motion to Strike Fieldpiece's Counterclaims (Doc. 99) is **DENIED**.

2. TRE shall have **TWENTY (20) DAYS** from the date of this Order to inspect the documents supporting Fieldpiece's alleged damages in a manner agreed to by the parties.

**DONE** and **ORDERED** in Orlando, Florida on June 18, 2014.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties