# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | | |
|---|---|---|
| **TWIN RIVERS ENGINEERING CORPORATION, a Florida corporation**, | ) ) ) | |
| Plaintiff, | ) ) | **CASE NO.: 6:12-cv-1794-Orl-40TBS** |
| **vs.** | ) ) | |
| **FIELDPIECE INSTRUMENTS, INC., a foreign corporation,** | ) ) ) | |
| Defendant. | ) | |

## POST-TRIAL BRIEF

COMES NOW Defendant/Counter-Plaintiff, Fieldpiece Instruments, Inc. ("Fieldpiece"), pursuant to this Court's request, and submits its post-trial brief, and in support thereof, re-incorporates its arguments as set forth in its Motion For Judgment On Partial Findings (Doc. 172) and states the following:

## I.     INTRODUCTION

The Parties entered into a written contract in 2006 concerning two (2), and only two (2), forms of consideration.  Twin Rivers Engineering Corporation ("TRE") granted Fieldpiece the exclusive, worldwide right to practice TRE's patents in the HVAC market, and Fieldpiece granted TRE the right to use its plastic product housing so that TRE could sell TRE's product in the automotive market.  Prior to ever meeting TRE, Fieldpiece had designed a steel "mold" used to manufacture plastic housings for Fieldpiece's products.  This mold was designed to accommodate multiple products offered by Fieldpiece.  Prior to being approached by TRE, Fieldpiece already had several products contained within the plastic housing at issue here.

During their trip to Taiwan, to meet with the product manufacturer, CHY, Inc. ("CHY"), and prior to the written Business Agreement being signed, TRE and Fieldpiece agreed that TRE could use Fieldpiece's existing housing to offer its product for sale in the automotive market. There is only one (1) plastic housing. This housing is used in both the HVAC and automotive markets. The only difference in the two (2) products is the software that TRE programs onto the integrated circuit ("IC"), contained within the plastic housing.

As the attached demonstrative exhibit shows, Exhibit 1, all of the product housing was manufactured and supplied by CHY for both markets. Fieldpiece authorized CHY to use Fieldpiece's existing plastic housing for TRE's automotive orders pursuant to the agreement with TRE in the Business Agreement. As depicted in Exhibit 1, TRE programmed IC's with software applicable to either the HVAC or automotive market. TRE shipped the IC's to CHY for inclusion in Fieldpiece's plastic housing. CHY would then ship the finished product to either Fieldpiece or TRE.

Fieldpiece is noticeably absent from the automotive portions of the flow chart. This absence is because Fieldpiece had no involvement in TRE's automotive orders, nor did Fieldpiece receive any money from either TRE or CHY for the use of its plastic housing in the automotive market. Fieldpiece never received money from the automotive market use because Fieldpiece previously agreed to allow TRE the right to use the plastic housing in exchange for Fieldpiece's right to exclusively practice TRE's patents in the HVAC market. There was no additional consideration received by Fieldpiece for the use of its plastic housing in the automotive market besides the right to practice TRE's patents in the HVAC market.

With the above as a background, Fieldpiece submits that TRE has failed to prove that it is entitled to relief on either Count of its Second Amended Complaint (Doc. 38), and conversely,

Fieldpiece has proved TRE is liable to Fieldpiece under both Counts alleged in Fieldpiece's Counterclaim (Doc. 51). Moreover, unlike TRE, Fieldpiece has proven its damages with reasonable certainty.

## II.     LEGAL AND FACTUAL ARGUMENTS

### A.     TRE Obtained The Right To Use Fieldpiece's Plastic Housing Pursuant To The Business Agreement

TRE obtained the right to use Fieldpiece's plastic housing pursuant to the Business Agreement. TRE had the technology to aid in the design of a handheld infrared leak detector. However, TRE lacked a vehicle to supply the technology to its customer. Both parties testified they made many oral agreements over a period of time that were memorialized in the written Business Agreement. The Business Agreement contains a merger clause evidencing this. (Joint Exhibit 15). Paragraph 2(m) states, "Merger – All prior agreements and understanding (written or oral) between the parties concerning the subject matter of this Agreement are hereby superseded by this Agreement." (Joint Exhibit 15). Both Parties testified the Business Agreement provided TRE with access to Fieldpiece's plastic housing. In addition, the Business Agreement requires any subsequent agreements be in writing. This precludes any subsequent oral agreement. Paragraph 2(n)(ii) states, "This Agreement may be hereafter amended only in writing duly executed by both parties". (Joint Exhibit 15). The testimony, the language of TRE's Second Amended Complaint (Doc. 38), the Business Agreement and the undisputed sequence of events, all lead to the only logical conclusion. Only the written Business Agreement provided TRE with the rights to access Fieldpiece's existing plastic housing.

Paragraph 11 of the Second Amended Complaint (Doc. 38) states, "[i]n 2006, TRE and Fieldpiece entered into a written Business Agreement, whereby TRE allowed Fieldpiece to sell infrared leak detectors, … in the HVAC market." Paragraph 25 states, "[i]n exchange for the use

of the Automotive Mold, TRE allowed Fieldpiece to sell infrared leak detectors in the HVAC

market." TRE's right to use the plastic housing was clearly obtained in exchange for TRE

allowing Fieldpiece to sell infrared leak detectors in the HVAC market pursuant to the language

in the Business Agreement.

TRE has admitted in its own sworn pleadings that TRE's right to Fieldpiece's plastic

housing was included in Sections 2(i) and 2(j) of the written Business Agreement. Paragraph 33

of the Second Amended Complaint (Doc. 38) states, "… Fieldpiece breached the Business

Agreement by failing to provide TRE with the Automotive Mold as contemplated in Sections 'i'

and 'j' of the Business Agreement." Paragraph 33 further states the agreement as to the use of

Fieldpiece's automotive housing was "confirmed in an oral agreement". The clear meaning of

the word "confirm" is to further ratify or give further assurances of something already agreed

upon.

Paragraph 34 of the Second Amended Complaint (Doc. 38) states, "[s]pecifically, for

rights to sell products in the HVAC market, Fieldpiece promised to provide the Automotive

Mold to TRE in furtherance of Fieldpiece's agreement to 'support TRE's efforts in the

automotive market'." The quoted language comes directly from Section "i" of the Business

Agreement. Also, as shown above, Paragraph 25 states, "TRE allowed Fieldpiece to sell infrared

leak detectors in the HVAC market in exchange for the use of the automotive mold."

Lastly, Paragraph 35 states, "…Fieldpiece breached Sections 2(i) and 2(j) of the Business

Agreement by failing to allow TRE to use the Automotive Mold." This is clearly an admission

by TRE that the right to the automotive mold came from the Business Agreement. If not,

Fieldpiece would not have been capable of breaching the Business Agreement by failing to allow

TRE to use the automotive mold, assuming Fieldpiece was ever capable of breaching a terminable at will agreement.

In addition to the admissions in TRE's Second Amended Complaint (Doc. 38), both parties testified TRE's right to access Fieldpiece's automotive housing came from the Business Agreement. On direct examination, Rey Harju testified in response to TRE's counsel's questions, that there were many discussions from 2001 to 2006 with Mr. Williams. Mr. Harju testified that all the discussions centered around Fieldpiece providing a housing for TRE's technology in exchange for the exclusive right to practice TRE's patents in the HVAC market. Mr. Harju also testified the oral agreements between himself and Mr. Williams were prior to signing the Business Agreement, and always included Fieldpiece allowing TRE access to Fieldpiece's existing plastic housing in exchange for exclusive rights to sell product in the HVAC market.

The Court can also look to Mr. Williams' testimony. On cross-examination, Mr. Williams was asked if he agrees that the Business Agreement gave TRE access to Fieldpiece's plastic housing. Mr. Williams answered, yes. Mr. Williams also testified that TRE's right to access Fieldpiece's plastic housing was discussed on the Parties' trip to visit CHY in Taiwan, prior to the Business Agreement being signed. Mr. Williams testified the oral agreements made during the trip to Taiwan were incorporated into the Business Agreement.

Therefore, based upon the admissions in TRE's Second Amended Complaint (Doc. 38), and the testimony of both Parties, the Court can only come to the conclusion that TRE's access to Fieldpiece's plastic housing was granted in the written Business Agreement and only in the Business Agreement.

### B.    The Alleged Oral Agreement Is Unenforceable

### 1. The Oral Agreement Fails Due To A Lack Of Consideration

If this Court determines that a subsequent Oral Agreement was intended by both parties, the alleged Oral Agreement fails for lack of consideration. Without consideration, a contract is not valid. *The Am. Nat'l Bank of San Francisco v. A.G. Sommerville, Inc. et al.*, 191 Cal. 364, 371-72 (1923) (citing *Gamble v. Tripp,* 99 Cal. 223, 226 (1893); *Wheat v. Bank of California,* 119 Cal. 4, 6 (1897)) (A contract that fails of consideration is "voidable and incapable of enforcement.").

California law requires that "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise." CAL. CIV. CODE § 1605 (emphasis added). "An obligation already owed by the promisee to the promisor is not consideration." *Pacific Millennium v. Central Valley Ranch, LLC, et al.*, No. D059731, 2013 Cal. App. LEXIS 4995 (Cal. Dist. Ct. App. 2013). Only if the promise in the subsequent contract imposes upon the promisor "a new detriment and confers upon the promisee a new benefit" is there "sufficient consideration for the promise of another to pay for his costs." *Am. Nat'l Bank*, 191 Cal. at 371-72. (citing CAL. CIV. CODE § 1605). A pre-existing legal duty exists when the duty of performance under a subsequent contract is the same as that owed under the prior contract. *Am. Nat'l Bank*, 191 Cal. at 371-72.

In an example of the application of the established rule in California, the Second District explains that "a promise of extra compensation for completion of a contract to a promisee who has at the time a pre-existing legal duty to perform the contract is without consideration." *Bailey v. Breetwor et al.*, 206 Cal. App. 2d 287, 291-92 (Cal. Dist. Ct. App. 1962).

As noted above, Mr. Harju's and Mr. Williams' testimony clearly show that use of the mold (to create housings) was given in the Business Agreement to TRE for the automotive industry prior to any subsequent alleged Oral Agreement. On cross examination, Mr. Williams was asked what the terms of the alleged Oral Agreement were. He replied that the terms were that TRE would *continue* to use the mold to produce products until termination of the agreement occurred. Mr. Williams also agreed that TRE received access to the mold via the Business Agreement. If Fieldpiece gave TRE access to the mold in the Business Agreement, Fieldpiece had nothing left to give TRE. As Mr. Baker testified, the HVAC product housings were produced in the same mold as the automotive product housings. The only consideration Fieldpiece ever had was ownership of the mold. No other consideration was given to TRE by Fieldpiece.

Mr. Williams further testified that in the Oral Agreement, Fieldpiece was given "a great product" by TRE (meaning the patented technology via exclusive license). Then he testified that the same thing was given to Fieldpiece in the Business Agreement. The only consideration TRE gave at any point was an exclusive license to use the patented technology.

In addition to the evidence, including oral testimony, the Second Amended Complaint fails to even allege valid consideration for the alleged Oral Agreement. Not only did TRE allege that Fieldpiece received the same consideration in both the Written Agreement and the alleged Oral Agreement, but TRE also alleges that it *received* the same consideration. Paragraph 21 of TRE's Second Amended Complaint is incorporated under Counts I and II and alleges that Fieldpiece agreed to, "support TRE's efforts in the automotive market . . ." by performing "mutually agreed upon commercial functions at a reasonable mutually agreed upon price, based

upon commercial considerations in conformance with the California Commercial Code." (Doc. 38, ¶¶ 21, 32 and 38).

Under Count I, TRE alleges that, "Fieldpiece breached the Business Agreement by failing to provide TRE with the Automotive Mold" and "to 'support TRE's efforts in the automotive market," thereby alleging the duty of Fieldpiece to provide automotive molds and support was Fieldpiece's consideration for the Business Agreement. (Doc. 38, ¶ 33). It is also clear from the testimony that the use of the mold by TRE for creation of its automotive product housings was given under the Business Agreement to aid TRE in its automotive industry. Under Count II, TRE alleges that Fieldpiece had the identical duties as and for its consideration for the alleged Oral Agreement, specifically "to 'support TRE's efforts in the automotive market'" and "to provide Automotive Molds to TRE." (Doc. 38, ¶ 40). The clear and unambiguous allegations of TRE's Second Amended Complaint state that the consideration provided by Fieldpiece under the alleged Oral Agreement was, "an obligation already owed by [Fieldpiece] to [TRE] and is therefore, not consideration." *See Pacific Millennium*, 2013 Cal. App. LEXIS 4995. Likewise, the only consideration alleged by TRE for both the Business Agreement and Oral Agreement, is TRE's agreement to exclusively supply Fieldpiece with its patented technology.

Although the evidence shows that no oral agreements occurred subsequent to the Business Agreement and the Business Agreement incorporated any previous oral agreements, even if this Court finds a subsequent Oral Agreement was intended by the parties, it must fail for want of consideration. Since any subsequent Oral Agreement did not have new or different consideration compared with the prior Business Agreement, the alleged Oral Agreement is unenforceable and no breach by Fieldpiece could have occurred.

### 2.    The Business Agreement May Not Be Modified Orally

If this Court determines that the parties intended to create a subsequent oral agreement, it is not valid because it is an oral modification of the Business Agreement and is therefore invalid as contrary to the express terms of the Business Agreement and California law. California Civil Code Section 1698(c) states "[u]nless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement *supported by new consideration*." (emphasis added).

In *Beggerly v. Gbur*, 112 Cal. App. 3d 180, 188 (Cal. Dist. Ct. App. 1980) (citation omitted), the "plaintiff sought to prove subsequent oral modification of an integrated written contract" which gave "rise to application of Civil Code section 1698." The 2nd DCA held that the written agreement expressed a clear intent to preclude the oral modification claimed by the plaintiff and as such, within the meaning of Section 1698(c), the written contract expressly precluded the oral modification. *Id.* at 189.

The court further held that the oral modification was invalid and ineffective because it lacked being supported by new consideration within the meaning of Section 1698(c). *Id.* at 190. The court rejected the plaintiff's argument that his performance rendered the oral modification "executed" within the meaning of Section 1698. *Id.* The court stated "that there was an absence of consideration for the defendants' alleged promises" and "[t]hese promises, therefore, are simply gratuitous oral promises" which are ordinarily unenforceable under Section 1698. *Id.*

As noted above, Paragraph 2(n)(ii) of the Business Agreement states "[t]his Agreement may be hereafter amended only in writing duly executed by both parties." (Joint Exhibit 15). This modification barring language is even broader than the language used in the written agreement in *Beggerly*. *Id.* at 189. It is clear based upon this term of the Business Agreement

and the application of Section 1698(c) to it that the only result is that any alleged subsequent Oral Agreement is not valid.

Paragraph 33 of the Second Amended Complaint (Doc. 38) under Count I, states that the Business Agreement was "<u>confirmed in an oral agreement</u> . . . ." (emphasis added). The only way to interpret this allegation is that the Oral Agreement came after the Business Agreement and confirmed what was in the Business Agreement. Paragraph 39 of the Second Amended Complaint (Doc. 38) under Count II, uses identical language.

Any alleged subsequent Oral Agreement must have been an attempt at modifying the Business Agreement. The Business Agreement, however, cannot be modified except in writing. Additionally, the limited circumstances where oral modification would be proper did not occur here. Instead, the Business Agreement and Section 1698(c) expressly precludes oral modification. Furthermore, there was no proper consideration by either party, at most only gratuitous oral promises. Any attempt by the parties to create a subsequent Oral Agreement was improper and if this Court determines that the alleged Oral Agreement was attempted, this Court must also find that it was attempted in vain and is unenforceable.

### 3. The Oral Agreement, If Any, Was Incorporated Into The Business Agreement

If this Court finds that a prior Oral Agreement was made, then it was incorporated into the Business Agreement. California Civil Code Section 1697 very clearly states that "[a] contract not in writing may be modified in any respect by consent of the parties, in writing, without a new consideration, and is extinguished thereby to the extent of the modification." 2(m) of the Business Agreement states that "[a]ll prior agreements and understanding (written or

oral) between the parties concerning the subject matter of this Agreement are hereby superseded by this Agreement." (Joint Exhibit 15).

When asked about the alleged Oral Agreement, Mr. Harju and Mr. Williams explained that there were many discussions and oral agreements prior to the Business Agreement and the Business Agreement incorporated these prior discussions and oral agreements. Mr. Williams agreed that there were many oral agreements. He never testified that any oral agreement occurred after the Business Agreement. In addition, both Mr. Williams and Mr. Harju testified to discussing the terms of the Business Agreement in Taiwan prior to the execution of the Business Agreement. If this Court determines that the alleged Oral Agreement occurred prior to the Business Agreement, then it was necessarily terminated, by law and by the terms of the Business Agreement and this Court cannot enforce any alleged breach of the Oral Agreement against Fieldpiece even if one existed.

**C.     Fieldpiece Did Not Breach The Business Agreement**

TRE alleges Fieldpiece's email dated October 11, 2012 was a breach of the Business Agreement. The law states otherwise. Fieldpiece's email was not a breach of the Business Agreement. To the contrary, Fieldpiece validly terminated the Business Agreement when it sent TRE the email dated October 11, 2012 stating, "[our] agreement with you regarding SPX is over." (Joint Exh. 2). "'Termination' occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach." CAL. COM. CODE § 2106(3) (2014). Here, the Court has previously ruled the Business Agreement was terminable at will. (Doc. 44). Therefore, by law, Fieldpiece was free to terminate the agreement.

When a contract is terminable at will by either party, as in this case, the terminating party only has to provide, "the adverse party with <u>reasonable</u> notice thereof." *Mile v. California*

*Growers Wineries, Inc.*, 45 Cal. App. 2d 674, 679 (Cal. Dist. Ct. App. 1941) (citing *Adkins v. The Model Laundry Co.*, 92 Cal. App. 575, 581 (Cal. Dist. Ct. App. 1928); 17 C.J. S. 887, sec. 398.) (emphasis added). Fieldpiece asserts the modifier "reasonable" relates to whether or not the notice was "reasonable" in its content and did the notice fairly communicate Fieldpiece's intention to terminate the agreement. *See Western Camps, Inc. v. Riverway Ranch Enterprises*, 70 Cal. App. 3d 714, 723 (Cal. Dist. Ct. App. 1977).

However, even if the Court were to find the modifier "reasonable" relates to the timing of the notice of termination, Fieldpiece asserts the timing was reasonable as well. The email correspondence from CHY shows that TRE only had ten (10) pieces on order at the time of termination. (P's Exh. 11). The evidence also shows that Fieldpiece instructed CHY to fill this pending order of ten (10) pieces. (P's Exh. 27). Therefore, Fieldpiece provided TRE with reasonable notice in terms of both time and content of the termination.

Even if the Court finds Fieldpiece breached the Business Agreement, which it did not, TRE has not proven it was damaged. TRE's Second Amended Complaint alleges damages due to unfilled orders for Chrysler Corporation and General Motors in the amounts of 2800 and 3300 units respectively. (Doc. 38, ¶ 28, ¶ 46). However, at trial Mr. Williams expressly abandoned TRE's claim for damages as it relates to the alleged 3300 unit order from General Motors. As Fieldpiece has argued steadfastly, TRE has no proof of damages and this proves it. The Court is then left with the allegation concerning the alleged 2800 unit order.

TRE's sole piece of documentary evidence to support this allegation is P's Exh. 44, a request for quotation, ("RFQ"), dated March 20, 2012, seven months prior to any alleged breach by Fieldpiece. On direct examination in TRE's case in chief, Mr. Williams testified that an RFQ is a "warning" a purchase order is coming. Mr. Williams further testified that sometimes it is *as*

*long as* six (6) months before a purchase order is issued. Here, the RFQ relied upon was issued

seven (7) months prior to any alleged breach and no purchase orders were *ever* issued. This is

clear evidence that TRE did not have an order for 2800 units.

When Mr. Williams was asked on cross examination how he came to the figure of

$532,336.00 in damages, he stated he added 1500 from the first page and 1500 from the second

page of P's Exh. 44 and 1000 from P's Exh 45. However, Mr. Williams' arithmetic based on

that theory adds up to 4000 units and damages in excess of $760,000.00. This theory is

completely unbelievable and factually incorrect on a number of levels. First, TRE did not even

submit P's Exh. 45 into evidence. Second, Mr. Williams expressly abandoned any damage

requests from alleged General Motors orders. Third, Mr. Baker testified on cross examination

that Mr. Williams' testimony that P's Exh 44 was two (2) separate orders was incorrect. Fourth,

Mr. Baker testified on cross examination that Mr. Williams' testimony that the different number

of units on P's Exh 44 were due to price differentials was incorrect. Fifth, nowhere on P's Exh

44 does the number 2800 exist. Sixth, Mr. Baker testified that some of the alleged orders on P's

Exh 44 were filled but could not state the exact number without looking at actual purchase

orders. Mr. Baker then testified TRE did not have any purchase orders to produce during

discovery. Seventh, TRE's only evidence as to this 2800 amount is inadmissible as hearsay

within hearsay, in violation of Federal Rule of Evidence 805 and should be excluded by this

Court. Over Fieldpiece's objections, Mr. Baker testified that Mr. Williams told him, (hearsay),

that SPX told Mr. Williams, (hearsay) that SPX intended to order 2800 units sometime in the

future. Even though two representatives from SPX were listed on TRE's "will call" witness list,

neither individual was called to testify about these allegations. Eighth, Mr. Williams testified he

was absolutely sure purchase orders for these 2800 units allegedly originally needed in March of

2012 would have been issued.  However, Mr. Williams later testified that *neither TRE nor anyone else* has filled this order two (2) years and four (4) months later.  Mr. Williams' testimony is simply not credible. Ninth, TRE failed to produce any evidence of its total cost of the product.  In fact, Mr. Williams admitted the amount of damages sought were gross revenue. Therefore, there is no way for this Court to calculate lost profits, the only legally recoverable form of damages.  Lastly, TRE refused to mitigate its damages despite the unconditional offer from Fieldpiece to do so.  (Joint Exh. 14).  The real reason TRE refused was because it owed CHY $80,000.00. (Plaintiff's case, Williams' cross examination)

TRE's other form of damages is due to alleged costs to design a new mold.  Mr. Baker and Mr. Williams testified TRE had already begun designing and paying for a new mold in June of 2012, four (4) months *before* Fieldpiece terminated the agreement.  This is clearly an operational expense previously decided upon by TRE and in no way due to any act of Fieldpiece. The invoices TRE produced as evidence of its damages totaled $56,718.33.  The original estimate TRE received from CHY was $55,000.00.  The difference is nominal and CHY's original quote was an estimate.  Therefore, TRE cannot show it was damaged.  For the first time at trial, TRE claims it signed a promissory note in the amount of $120,000.00 for additional monies owed for services related to creating TRE's new product.  However, the promissory note was not presented as evidence and Mr. Williams testified he doesn't even know if the $56,718.33 amount is included in the alleged promissory note amount.  It is impossible for this Court to award TRE damages when TRE itself cannot even articulate the amount it is requesting.

> **D.  TRE's Grant Of A Non-Exclusive License To Inficon, Inc. Is A Breach Of The Exclusive Business Agreement**

On cross-examination Mr. Williams agreed TRE granted Fieldpiece the exclusive right to practice TRE's patents in the HVAC market.  As stated above, in part A, Mr. Harju testified

Fieldpiece insisted on exclusivity from the first day of negotiations due to the cost of bringing a product to market. Paragraph 2(g) of the Business Agreement states Fieldpiece is receiving an, "exclusive license to sell products covered by the patents into the HVAC market."

The unopposed evidence also proves that TRE granted Inficon, Inc. ("Inficon") a non-exclusive license to practice TRE's existing patents *as well as* any patents based upon any infrared gas analyzers or leak detectors, including, but not limited to D-Tek brand products. (See Defendant's Exhibit L, ¶¶ 3 and 4). It is well settled that a covenant not to sue and a non-exclusive license are one and the same. *See TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1274–77 (Fed. Cir. 2009) (holding that a settlement agreement containing a covenant-not-to-sue a patent infringer has the effect of "authorizing" or "licensing" sales by the covenantee).

As this Court is well aware, a party in a civil action must satisfy the finder of fact that they have proven their claim by a preponderance of the evidence. "A preponderance of the evidence means such evidence as, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved 'is more likely true than not true.'" *Sandoval v. Hagan*, 7 F. Supp.2d 1234, 1245 (M.D. Ala. 1998) (reversed on other grounds) (citing Pattern Jury Instructions, Basic Instruction No. 6.1 U.S. Eleventh Circuit District Judge's Association (Civil Cases) 1990). "The burden of proof in civil cases is the same regardless of whether the finder of fact is a judge in a bench trial or a jury." *Id.* (citing *Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir. 1994).

Fieldpiece has proven it is more likely true than not true that Inficon's handheld infrared leak detector sold during the 2009 through 2012 time period practiced on TRE's patents. Fieldpiece has also proven that TRE supplied its patented technology to Inficon. It is not a

requirement that TRE "physically" provide anything to Inficon. Patents are published. Inficon was licensed to obtain the public Patent and practice it. By granting Inficon a covenant-not-to-sue, TRE inherently supplied Inficon with its patented technology. Inficon was granted a license to TRE's patents and therefore was "supplied" with TRE's patented technology.

The forms and sources of evidence that Inficon's product practiced TRE's patents were numerous and credible. Most, if not all, of the evidence came from TRE. Mr. Williams agreed on direct examination, during Counter-Plaintiff's case, that TRE filed suit against Inficon for patent infringement on December 6, 2006. Paragraphs 13 and 14 contain sworn statements of TRE that by using, selling and/or offering to sell products, including but not limited to D-Tek infrared leak detector instruments, Inficon infringes the '088 and '993 patents. (D's Exh. Z).[1]

Mr. Williams testified he took Inficon's D-Tek product apart, was aware of its major components and how it worked. Mr. Williams testified his General Manager, Frank Baker, a shareholder of TRE and an electrical engineer David Katz, and TRE's patent attorney Mr. Steinberg, all agreed Inficon's product infringed. Mr. Williams testified it was "clear Inficon was directly infringing." (Defendant's case, Williams Direct Examination). Mr. Williams testified that any changes Inficon was required to make to comply with new SAE standards would still render its product infringing. Mr. Williams also testified that nobody can sell a handheld infrared leak detector without practicing TRE's patents. (Defendant's case, Williams Cross Examination).

Mr. Harju also testified that his initial opinion that Inficon's product did not infringe was based in part on chatter in the industry from Inficon that they did not think they infringed.

---

[1] Although Mr. Williams tried to convince this Court that the "Tracer brand" was the same as the D-Tek brand, TRE's pleadings dictate the opposite outcome. The Complaint specifically references D-Tek and Exhibit C to the Complaint only references D-Tek. Furthermore, the settlement agreement with Inficon does not mention Tracer but specifically references D-Tek. This testimony was not credible and was merely a last ditch attempt to avoid liability under FDUTPA.

However, Mr. Harju testified that he became familiar with the patents in issue, spoke with patent attorneys and examined Inficon's product in late 2012/2013 and became convinced the D-Tek model violated TRE's patent.

Mr. Ault testified, as part of his duties at Fieldpiece, he needs to know how Fieldpiece's competitor's products work. Mr. Ault testified he first took Inficon's product apart in 2008/2009 because Fieldpiece's product was giving false positive beeps and he wanted to see if he could learn anything from his competitor's design. Mr. Ault testified he again took Inficon's product apart after this lawsuit was filed and after he studied the remaining claims of the patent to see if anything had changed in Inficon's design and to see how Inficon's design related to the patent. Mr. Ault testified he did not see any changes to Inficon's product based on these inspections.

Perhaps most telling of all is there was a complete lack of any evidence that Inficon made <u>any</u> changes to its product. Not a single witness from TRE testified that Inficon's product was changed at all. On cross-examination, Mr. Harju summed it up the best when he testified, "why would Inficon change a product they had a license for?" It is more likely true than not true that, after Inficon spent years in litigation and in the reexamination process, at a presumed cost of hundreds of thousands of dollars, and then paid TRE two hundred thousand dollars ($200,000.00) for a license to TRE's patents, Inficon had no motivation to change their product and did not.

Fieldpiece has proven its damages with reasonable certainty. "It is well established that damages consisting of the loss of anticipated profits need not be established with certainty." *Hacker Pipe & Supply Company v. Chapman Valve Manufacturing Company* , 17 Cal.App.2d 265 "It is sufficient that it be shown as a reasonable probability that the profits would have been earned except for the breach of the contract." *Id*. "While the actual amount of damages

from the breach of a contract may not be susceptible of exact proof, the law does not permit one whose act has resulted in loss to another to escape liability on this account … the law requires only that the best evidence be adduced of which the nature of the case is capable." *Id*. (citing *Pye v. Eagle Lake Lumber Co.*, 66 Cal.App. 584.)

On direct examination, Mr. Ault clearly established that as a member of Fieldpiece's Board of Directors and his day to day involvement in every facet of the company's financial well being and planning that Mr. Ault has the most and best knowledge to testify concerning Fieldpiece's lost profits. Mr. Ault testified in great detail exactly how he arrived at Fieldpiece's per piece profit of $104.83 on each hand held leak detector it sold. Mr. Ault also testified in great detail concerning his responsibility to forecast sales and prepare the annual budget for Fieldpiece. As part of this responsibility, Mr. Ault, testified that he was required to have an intimate knowledge of what Fieldpiece's competitors were selling in the marketplace. Mr. Ault testified about the many ways he used to establish with reasonable certainty the sales of its sole competitor in the handheld infrared leak detector market, Inficon.

Mr. Harju, founder and President of Fieldpiece, testified that Inficon's D-Tek brand is Fieldpiece's sole competitor in this particular market. Mr. Harju also testified, based upon his knowledge in the industry, that Inficon was "way bigger" than Fieldpiece concerning sales of hand held infrared leak detectors. Mr. Williams and Mr. Baker also agreed that Inficon was Fieldpiece's sole competitor in this market.

Mr. Ault testified that Fieldpiece sold 11,776 units during the time period of October 2009 through November 2012. With the unopposed testimony that Inficon outsold Fieldpiece during this period, it is reasonable to assume that Inficon sold at least the same amount of product as Fieldpiece or 11,776 units. However, Mr. Ault and Mr. Harju both testified that

Inficon was outselling Fieldpiece, on average, 2 or 3 to 1. This information was not based upon speculation. To the contrary, Mr. Ault testified to the hundreds of visits to Fieldpiece's distributors where he would personally view the amount of product for sale by Inficon. Mr. Ault also testified on cross examination that on his hundreds of visits, there was never a time that he saw more Fieldpiece products than Inficon products. There were times, however, he saw no Fieldpiece products but did see Inficon products. Mr. Ault was also responsible for forecasting sales relating to competitor sales and conducted regular meetings with field representatives to determine competitor sales. Mr. Ault also testified how he tracked Inficon's inventory via Fieldpiece's largest distributor. Mr. Ault is able to forecast inventory to eventual sales based upon his responsibility to perform this function for Fieldpiece. Mr. Ault was therefore likewise able to forecast Inficon's sales based upon its inventory, and the other factors listed above.

Based upon all of Mr. Ault's experience and personal knowledge, Mr. Ault testified that Inficon would have sold at least 11,776 and more likely approximately 30,000 units for the relevant time period. These numbers are far from speculation. Mr. Ault's testimony is based upon years of personal observations.

If TRE had not granted Inficon a license to practice TRE's patents in the HVAC market, Fieldpiece would have made these sales. Mr. Ault testified that Fieldpiece has broader distribution than Inficon and would have been able to fill these additional orders. In addition, the testimony clearly showed that the infrared leak detector was a premium product that works better than other methods of leak detection. Although, TRE attempted to show Inficon sold comparable products, Mr. Ault clearly explained why these other products were not acceptable substitutes. Mr. Ault testified the heated diode models are not as effective and cost several hundred dollars less than infrared models. Mr. Ault also testified the Tek-Mate model was not

infrared, the Whisper model detected leaks audibly and the Compass was an inferior predecessor. Mr. Ault also testified that liquid soap can also be considered a "leak detector". In short, the infrared leak detector is the premium model in this market and someone looking for that particular tool will not settle for an inferior replacement.

### E. Fieldpiece Did Not Waive TRE's Breach

TRE and Fieldpiece executed the Business Agreement in April 2006. It is an undisputed fact that Mr. Williams told Mr. Harju TRE was going to sue Inficon over Inficon's sales of the D-Tek handheld leak detector. TRE, in fact, filed suit against Inficon for patent infringement concerning the D-Tek brand model in December 2006. Although Fieldpiece continued to see D-Tek brand products for sale, Mr. Harju testified he thought it was because lawsuits can take years to resolve. As an example, this lawsuit was filed on November 27, 2012 and did not go to trial until July 14, 2014, nearly two years later.

In November 2009, Mr. Williams informed Mr. Harju, via email, that "[t]he Patent Law suit against Inficon has been settled, we retained our Patents!! This will keep all interlopers out of the infrared product business. Inficon will continue selling their product through Tracer, there [sic] list price is $ 565.00 WOW, I don't think that's much competition." (Joint Exh. 7) Mr. Harju and Mr. Ault testified that because the email affirmatively stated Inficon would be selling only under the "Tracer" brand they believed TRE was successful in removing Inficon from the HVAC market because the email made no mention of the D-Tek brand. (Defendant's case, Williams Direct Examination; Defendant's case, Ault Direct Examination).

Because the November 2009 email from Mr. Williams was deceptive, Fieldpiece wondered why they still saw D-Tek products for sale. Mr. Harju testified that Mr. Williams would not give him any details of the settlement despite Mr. Harju's requests. Because Mr.

Williams would not tell Mr. Harju the terms of the settlement agreement, Mr. Harju's only alternative was to try to extract the information out of Mr. Williams. These attempts are shown by Mr. Harju's email requesting what royalty Inficon was paying TRE. (Joint Exh. 7). Mr. Harju had no knowledge that Inficon was paying TRE a royalty. In fact, when the settlement agreement was finally and first produced by TRE in July 2013, Fieldpiece was able to confirm a lump sum was paid to TRE and not a royalty.

TRE also relies on Mr. Harju's email asking Mr. Williams about the terms of the settlement agreement that states, "we know the Inficon guys . . . . I can ask them if you don't want to comment". (Joint Exh. 7). Again, this is merely another attempt to have Mr. Williams disclose the terms of the settlement agreement. Mr. Ault testified that although Fieldpiece knows certain Inficon employees, via attendance at trade shows, there was no way Inficon would have told them the terms of their agreement with TRE. This scenario is the same as someone from General Motors asking somebody they know at Ford for the terms of Ford's licenses.

The real question is why would Fieldpiece have to obtain the terms of the settlement agreement from its competitor and not from its business partner? The answer, because TRE didn't want Fieldpiece to know it granted Inficon a license in violation of Fieldpiece's exclusive rights. Based upon the above, it is clear that Fieldpiece did not waive TRE's breach. In fact, TRE refused to provide Fieldpiece with any information regarding the settlement agreement, and the information it did provide was false and deceitful.

## F. Fieldpiece Did Not Fail To Mitigate Its Damages

TRE claims Fieldpiece failed to mitigate its damages because it did not file suit against Inficon and because it did not send a cease and desist letter to Inficon at the same time it sent a similar letter to Bacharach. (Doc. 175, p. 5). The subject line of the letter states, "Infrared Leak

Detector Trade Dress Infringement".  The main thrust of the letter was to advise Bacharach that the product it began to sell violates Fieldpiece's trade dress rights.  (P's Exh. 48)  Additionally, both arguments put forth by TRE are legally impossible.  First, Fieldpiece had absolutely no cause of action against Inficon for patent infringement because TRE granted Inficon a license to practice TRE's patents in October 2009.  Second, for the same reason, Fieldpiece could not send a cease and desist letter to Inficon alleging Inficon was violating TRE's patents because Inficon was licensed to do so.  Because of TRE's breach of the Business Agreement, as well as its deceitful email, TRE deprived Fieldpiece of any possible ability it may have had to mitigate its damages.

### G. Fieldpiece Is Entitled To Damages Due To TRE's Violation Of FDUTPA

As stated in Plaintiff's Rule 52 Motion, FDUTPA requires that Fieldpiece prove "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."  *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006) (citations omitted); *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1292 (M.D. Fla. 2009) (citations omitted).  Fieldpiece has proven that based upon the email of Mr. Williams and the grant of the license to Inficon, TRE caused Fieldpiece actual damages.

The evidence is clear that the email from Mr. Williams dated November 6, 2009 (Joint Exhibit 7) was a deceptive and unfair act in conjunction with the granting of the license to Inficon to sell infrared leak detectors via the covenant-not-to-sue in the settlement agreement with Inficon.  The intent of the email was clearly to deceive Fieldpiece regarding TRE's grant of a covenant-not-to-sue Inficon concerning leak detectors.  As mentioned above, the email first stated that the "Patent Law suit against Inficon has been settled, we retained our Patents !!"

Although the lawsuit was settled, the patents were not fully retained. In fact, one patent was completely invalidated and the other had numerous claims invalidated.

The email further stated that "[t]his [meaning the settlement of the lawsuit] will keep all interlopers out of the infrared product business." Contrary to keeping Inficon out of the infrared product business, by granting Inficon a license to practice the patents, through the covenant-not-to-sue, Inficon was given the license to sell infrared leak detectors which the evidence clearly showed it did.

Finally, the email stated "Inficon will continue selling their product through Tracer . . . ." As testified to in trial, Tracer is the automotive brand name for leak detectors sold in the automotive market. Fieldpiece never sold leak detectors in the automotive market and Mr. Williams knew that. Tracer products do not compete with Fieldpiece's products, which are used only in the HVAC market. Inficon's competitive product in the HVAC market is the D-Tek product. Mr. Williams intentionally left out this information to deceive Fieldpiece. The settlement agreement with Inficon does not even mention Tracer brand products. (D's Exh. L). It only mentions D-Tek brand products. (D's Exh. L).

According to Chief Judge Gross in *Dorestin v. Hollywood Imps., Inc.*, 45 So. 3d 819, 825-26 (Fla. Dist. Ct. App. 2010) (Gross, C.J., concurring specially), "Florida case law has adopted the definition of *Rollins, Inc. v. Heller*, 454 So. 2d 580 (Fla. 3d DCA 1984), which limits "actual damages" to 'benefit of the bargain' damages." The court stated, however, that "[t]his limitation is contrary to the legislative intent of FDUTPA, which is to liberally construe the statute to protect the consuming public, and contrary to the way many state courts have construed identical language in similar consumer protection statutes." *Id.* at 826. "Part of the 'liberal' construction required by the statute is to construe statutory damage remedies in a way

that makes consumers whole." *Id.* This is also the intent of FDUTPA according to the legislature. *Id.*

As this Court has previously stated, Section 501.211(2), Florida Statutes, states that Fieldpiece "must demonstrate that it 'suffered a loss' as a result of a 'violation of this part' in order to recover actual damages." *Sun Prot. Factory, Inc. v. Tender Corp.*, 2005 U.S. Dist. LEXIS 35623, at *40 (M.D. Fla. Oct. 7, 2005). This Court further stated that under a FDUTPA claim, demonstration by a party leading to lost sales and lost profits constitutes a loss under Section 501.211(2). *Id.*

Both *Rollins* and *Siever* define actual damages as, "the difference in the market value of the product or service in the condition in which it was delivered according to the contract of the parties." *Rollins*, 951 So. 2d at 869 (citations omitted); *Siever*, 669 F. Supp. 2d at 1293-94 (citations omitted). Many cases dealing with lost profits provide damages after a breach of contract is discovered to put the non-breaching party in the place it would have been if the contract had not been breached. In this case, the period of time the damages (lost sales including lost profits) occurred was prior to Fieldpiece's discovery of TRE's breach and while the contract was in effect.

The actual damages suffered by Fieldpiece were the difference in the infrared leak detectors Fieldpiece did not sell versus the full value of the sales Fieldpiece would have made. Since Fieldpiece was denied those sales, Fieldpiece should be awarded the actual damages suffered which is the price of the products it should have sold but for TRE's deceptive and unfair acts. Fieldpiece's damages are the number of sales it should have had, 2-3 times Fieldpiece's sales over the relevant period of time totaling between 23,552 and 35,328 units, multiplied by the

profit per unit of $104.83 (sale price per unit minus the cost per unit). The total damages which should be awarded to Fieldpiece, therefore are between $2,468,956.16 and $3,703,434.24.

Dated: July 28, 2014.

/s/ Mark F. Warzecha
Mark F. Warzecha, Esq.
Florida Bar No. 0095779
**ZIES WIDERMAN & MALEK**
1990 W. New Haven Avenue, Suite 201
Melbourne, Florida 32904
Telephone: 321-255-2332
Facsimile: 321-255-2351
MFW@LegalTeamUSA.com
**Attorney for Defendant**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 28, 2014, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system. I further certify that the foregoing document is being served this date on all counsel of record or *pro se* parties, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Mark F. Warzecha
Mark F. Warzecha