## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**TWIN RIVERS ENGINEERING**       **CASE NO.:**   **6:12-cv-1794-Orl-36TBS**
**CORPORATION,**

     **Plaintiff,**

**v.**

**FIELDPIECE INSTRUMENTS, INC.,**

     **Defendant.**
_____/

## TWIN RIVER'S ENGINEERING'S
## WRITTEN CLOSING ARGUMENT FOLLOWING
## NON-JURY TRIAL BEGINNING JULY 14, 2014

Plaintiff, Twin Rivers Engineering Corporation ("TRE"), by and through its undersigned counsel submits is Written Closing Argument:

### A.    TRE'S Complaint: Breach of Oral and Written Contract Automotive Mold

#### 1.    The Oral And Written Agreement Regarding The Automotive Mold

To the extent that the record is unclear as to whether the oral contract was created before, after or simultaneous to when the Business Agreement was executed, the language of the Business Agreement does not preclude finding that an oral contract existed for two reasons: (1) if created prior or contemporaneous, the merger/integration clause is facially invalid/inapplicable; and (2) if after, the subsequent "in writing" requirement only applies to "amendments" and not to supplemental agreements that are not inconsistent with the Business Agreement.

#### a.    Prior - The Merger/Integration Clause is Inapplicable to Any Agreements for Help in the Auto Industry.

The Business Agreement states that "All **prior** agreements and understanding (written or oral) between the parties concerning the subject matter of this Agreement are hereby superseded

1

by this Agreement." The Business Agreement also provides that to support TRE in the auto market, "Fieldpiece will perform mutually agreed upon commercial functions at a reasonable mutually agreed up on price." (Joint 15). Thus, even if the oral contract was created prior to the Business Agreement, the merger clause does not prevent the Court from considering evidence that the oral contract existed and finding that the oral contract is valid and enforceable, because the Business Agreement itself precludes applicably of the integration clause for matters related to supporting TRE in the auto market.

"The purpose of an integration clause is to preclude the introduction of evidence which varies or contradicts the terms of the written instruments." *Amtower v. Photon Dynamics, Inc.*, 158 Cal. App. 4th 1582, 1609, 71 Cal. Rptr. 3d 361, 384 (Cal. Ct. App. 2008) citing Code Civ. Proc., § 1856, subd. (a); *Slivinsky v. Watkins–Johnson Co.* (1990) 221 Cal.App.3d 799, 804–805, 270 Cal.Rptr. 585. "The crucial issue in determining whether there has been an integration is whether the parties intended their writing to serve as the exclusive embodiment of their agreement." *Masterson v. Sine*, 68 Cal. 2d 222, 225, 436 P.2d 561, 563 (1968). "California cases have stated that whether there was an integration is to be determined solely from the face of the instrument" *Id. citing,* e.g., *Thoroman v. David* (1926) 199 Cal. 386, 389—390, 249 P. 513; *Heffner v. Gross* (1919) 179 Cal. 738, 742—743, 178 P. 860; *Gardiner v. McDonogh* (1905) 147 Cal. 313, 318—321, 81 P. 964; *Harrison v. McCormick* (1891) 89 Cal. 327, 330, 26 P. 830).

From the face of the writing, the Business Agreement cannot be considered the exclusive embodiment of the parties' agreement because the parties also specifically agreed that, in the future Fieldpiece would perform some undetermined, but mutually agreeable commercial

function to support TRE in the auto industry. Thus, the Business Agreement is not wholly integrated.

"When only part of the agreement is integrated . . . parol evidence may be used to prove elements of the agreement not reduced to writing." *Id. citing Hulse v. Juillard Fancy Foods Co.* (1964) 61 Cal.2d 571, 573, 39 Cal.Rptr. 529, 394 P.2d 65; *Schwartz v. Shapiro* (1964) 229 Cal.App.2d 238, 250, 40 Cal.Rptr. 189; *Mangini v. Wolfschmidt, Ltd.* (1958) 165 Cal.App.2d 192, 200—201, 331 P.2d 728; Rest., Contracts (1932) s 239.

In determining whether the Business Agreement is an integrated contract, and thus whether parol evidence is allowed, the court must consider such factors as "the language and completeness of the written agreement and whether it contains an integration clause, the terms of the alleged oral agreement and whether they contradict those in writing, whether the oral agreement might naturally be made as a separate agreement, and whether the jury might be misled by the introduction of parol testimony. We must also consider the circumstances surrounding the transaction and its subject matter, nature and object." McLain v. Great Am. Ins. Companies, 208 Cal. App. 3d 1476, 1484, 256 Cal. Rptr. 863, 867 (Cal. Ct. App. 1989)(internal citations omitted).

The Business Agreement is only partly integrated, and accordingly, parol evidence is admissible to prove additional terms which are consistent with those contained in the writing. The Business Agreement is not complete and the oral agreement does not contradict, but indeed supplements or supports, the Business Agreement.  Further, when considering the subject of the oral contract (support in the auto market) and the circumstances surrounding the transactions related to the oral contract (acting in accordance for 6 years), it is clear that the integration clause

3

does not apply to the oral contract or preclude evidence or a finding that the oral contract was valid.

If the oral contract was after the Business Agreement, the integration clause would not bar the oral agreement, regardless of its topic. *See* In re Ins. Installment Fee Cases, 211 Cal. App. 4th 1395, 1414, 150 Cal. Rptr. 3d 618, 632 (Cal. Ct. App. 2012) (separate agreement that is future to insurance contract is not barred by insurance contract's integration clause) (in addition to the "prior" language in the clause).

### b.  <u>Prior or Contemporaneous:</u>

Even if the Court determined that a document was intended to be the final agreement of the parties superseding all other transactions, the terms set forth in the contract "may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement. Thus, a prior or contemporaneous collateral oral agreement relating to the same subject matter may sometimes be admitted in evidence. However, this is true only where it is consistent with the terms of the integration." Hayter Trucking, Inc. v. Shell W. E&P, Inc., 18 Cal. App. 4th 1, 14, 22 Cal. Rptr. 2d 229, 237 (Cal. Ct. App. 1993).

### c.  <u>After/Future – The "Amended Only in Writing" Clause is Inapplicable to the Oral Agreement.</u>

The Business Agreement states that "This Agreement may be hereafter amended only in writing duly executed by both parties." First, "amended" is not defined by the agreement, nor is it technical or given a special meaning by the parties. "The words of a contract are to be understood in their ordinary and popular sense." Cal. Civ. Code § 1644 (West).  Black's Law Dictionary defines 'amend' as "to make right; correct; rectify" or "to change the wording of; to alter formally by adding or deleting a provision or by modifying the wording." Black's Law

4

Dictionary 33 (2nd Pocket ed. 2001).  The terms of the oral agreement do none of these things; they do not contradict or otherwise change or alter the Business Agreement at all.  Thus, the terms of the oral agreement need not be in writing. Instead, the oral agreement is 'supplemental' to the Business Agreement, i.e. it is "supplying something additional" and is "adding what is lacking." *Id.* at 681; s*ee also Hayter Trucking, Inc. v. Shell W. E&P, Inc.,* 18 Cal. App. 4th 1, 20-21, 22 Cal. Rptr. 2d 229, 242 (Cal. Ct. App. 1993) ("The [California] Code of Civil Procedure does not define the term "supplemented." However, the verb "supplement" is commonly defined to mean "to fill up or supply by additions ... add something to ... fill the deficiencies of...." (Webster's New Internat. Dict. (3d ed. 1986) p. 2297.)").

Even if the contract expressly precludes oral supplements to the contract, "Plaintiff is nevertheless entitled to *explain* the terms of its contract with [defendant] by course of dealing or usage of trade." *Hayter Trucking, Inc. v. Shell W. E&P, Inc.,* 18 Cal. App. 4th 1, 21, n. 4 (Cal. Ct. App. 1993) (citing Code Civ. Proc. Sect. 1856(c) (exceptions to admission of parol evidence)).  Thus, TRE is permitted to explain the terms of the Business Agreement (specifically Sect. 2(i) discussing that Fieldpiece will perform mutually agreed upon commercial function to support TRE's efforts in the auto industry) by explaining the "course of dealing" or "usage of trade" utilized by the parties related to the auto mold.

The California Uniform Commercial Code provides that "[a] course of performance or course of dealing between the parties ... is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." (§ 1303, subd. (d).) A " 'course of performance' " exists when "the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party." (§ 1303, subd. (a)(1).) A " 'course of dealing,' " on the other hand,

requires "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." (§ 1303, subd. (b).)

In the California Code Comment to section 2202, it is stated:

> "Under this section the theory of the former California parol evidence rule is altered. See Official Comment 1. Rather than assuming that the parties intended a fully integrated document, section 2202(b) assumes that a written contract does not express the full agreement of the parties unless the court expressly so finds."

Paragraph (a) enlarges the permissible use of trade usage and custom to explain **or supplement a written memorandum or agreement**. See Code of Civil Procedure s 1870(12) allowing usage to be put in evidence 'as an instrument of interpretation,' (citations)." *Balfour, Guthrie & Co., Ltd. v. Gourmet Farms*, 108 Cal. App. 3d 181, 187-88, 166 Cal. Rptr. 422, 426 (Cal. Ct. App. 1980).

### 2.      There is Adequate Consideration for the Oral Agreement.

In the Business Agreement, TRE granted Fieldpiece an exclusive right to sell the leak detectors in exchange for Fieldpiece agreeing to support TRE's efforts in the automotive market by performing "mutually agreed upon commercial functions."  The Oral Agreement is merely one example of the "mutually agreed upon commercial functions" that the parties agreed Fieldpiece would perform in exchange for the exclusive right to sell the leak detectors. Another example is Fieldpiece's agreement not to sell in the automotive market.

### 3.      The Parties Performed Under The Oral  And Written Agreement.

Moreover, an implied-in-fact contract "may be inferred from the conduct, situation or mutual relation of parties [and] consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in word." *See*

*White Dragon Productions, Inc. v. Performance Guarantees, Inc. 196 Cal. App. 3d 163, 172 (Cal. Ct. App. 1987).* TRE asserts that the Oral Agreement allowed it to use the Automotive Mold, which is also consistent with the Business Agreement and Fieldpiece's obligation to support TRE in the automotive industry.  Likewise, Fieldpiece admits that it allowed TRE to use the Automotive Mold for "over six (6) years." Jt. Pre-Trial Stip. [DE 127 at ¶ 6(m)]. It may be inferred from the conduct of the parties, i.e. that Fieldpiece permitted and encouraged TRE to use the Automotive Mold, that there was a mutual, implied-in-fact contract to do so. *See id.*

"Any acts evincive of an intent to abide by the contract are evidence of an affirmance of the contract."  *Ruhl v. Mott*, 120 Cal. 668, 677 (1898). Fieldpiece acted in accordance with the Oral Agreement and Business Agreement for over six years by allowing TRE to use the Automotive Mold in exchange for TRE granting Fieldpiece an exclusive license to sell the leak detectors. *See* Answer [DE 51 at ¶ 22]; Affidavit of Rey Harju [DE 16, p. 15 of 17 at ¶ 8] ("TRE and Fieldpiece were also parties to a separate oral agreement . . ."); Fieldpiece repeatedly acted with intent to abide by the Oral Contract, and therefore affirmed the existence of the same.

### 4.   TRE's DAMAGES

TRE was not able to fill orders or ship any products from October 2012 through April 24, 2014.  As a result of Fieldpiece's breaches TRE is indebted to Electronic Precepts in the amount of $120,000 associated with the cost of building a new mold.  Invoices to date total $57,803.33. (TRE 33, 34, 35, 36, 39, 40, 41).  Mr. Williams testified that TRE has paid approximately $30,000 on the invoices.  Fieldpiece stopped a shipment to SPX which damaged TRE in the amount of $1,962.20.  (TRE 6).  Additionally, under the Request for Quote (RFQ) program (TRE 44), TRE was unable to issue purchase orders for SPX for 2800 units in 2012 at $190.12 per unit.

7

Mr. Baker and Mr. Williams testified that TRE's cost for the product, for United States products, is $142.00, which is paid to CHY.

TRE has been damaged as follows:

**1) Cost of New Mold**

| | |
|---|---|
| $57,808.33 | Invoice Total |
| -30,000.00 | Amount Paid On Invoices |
| $27,803.33 | (Amount included in the promissory note) |

| | |
|---|---|
| $120,000.00 | Promissory Note Amount |
| -$27,803.33 | Amount Included From Invoices |
| $92,129.67 | |
| + $30,000 | Amount Paid On Invoices |
| **$122,129.67** | Total Amount Spent On New Mold |

**2) Lost Profit On Sales On 2800 Units**

- 2800 x $190.120 = 532,336.00     (TRE 44)
- $190.12(sale amount) -$142 (cost) =     $48.12 (profit)
- $48.12 x 2800     =     **$134,736 (Total Lost Profit)**

**3) Lost Profit On Sales On Stopped Shipment (10 Units)**

- $48.12 (profit) x 10 (number of units)=  **$481.20**

**4) TRE Total Damages**

| | |
|---|---|
| $122,129.67 | (Automotive Mold) |
| $134,736.00 | (Lost Profit On 2800 Units) |
| $481.20 | (Lost Profit On Stopped Shipment) |
| **$257,336.87** | **Total** |

"Where the *fact* of damages is certain, as here, the *amount* of damages need not be calculated with absolute certainty. The law requires only that some reasonable basis of computation be used, and the result reached can be a reasonable approximation." *Acree v. Gen. Motors Acceptance Corp*., 92 Cal. App. 4th 385, 398, 112 Cal. Rptr. 2d 99 (2001).  "[With]

8

respect to the measure of damages, the trial court found that *because of the activities of appellants,* the actual amount of the damages suffered by GHK is too difficult to determine at this time with requisite certainty. Contrary to appellants' argument, this finding does not constitute a "failure of proof" by GHK, and does not necessitate an award of nominal damages." *GHK Associates v. Mayer Grp., Inc.,* 224 Cal. App. 3d 856, 873, 274 Cal. Rptr. 168 (Cal. Ct. App. 1990)(emphasis in original).

California law "requires only that some reasonable basis of computation ... be used, and the damages may be computed even if the result reached is an approximation." (*GHK, supra,* 224 Cal.App.3d at p. 873, 274 Cal.Rptr. 168.)   TRE's damages are NOT even speculative and conjectural.  TRE did not obtain a physical purchase order, due to Fieldpiece's breach.  Because the wrongful acts of Fieldpiece have created the difficulty in proving the amount of loss of profits, only some reasonable basis of computation of damages should be used, i.e. relying/giving weight to TRE's testimony as to how many products were "ordered" by SPX that TRE could not fulfill because of Fieldpiece's breach.  Mr. Williams and Mr. Baker's testimony is a reasonable basis for computing damages, especially since the sale and the amount of profits would be certain and given that it is Fieldpiece's breach that makes proving them otherwise difficult (producing a purchase order).

**B.**     **Fieldpiece's Counterclaim**

**1.**     **TRE Never Supplied the Patented Technology to Inficon**

Fieldpiece alleged in its Counterclaim that TRE breached the Business Agreement by "supplying" the Patented Technology to third parties. (D.E. 51, ¶22.).  The only third party at issue at trial was Inficon.  Mr. Harju testified that he took apart Inficon's infrared leak detector, that he consulted with his patent attorney, and that he does not believe that Inficon's product

9

infringes TRE's patents.   Fieldpiece did not provide any evidence that Inficon sold a leak detector from 2009-2012 that infringed upon TRE's patent.   Thus, Inficon was not selling products covered by the Patented Technology in violation of Fieldpiece's exclusive license. Even assuming, arguendo, that TRE, through its covenant not to sue, supplied the Patented Technology to Inficon, Inficon did not use the Patented Technology.   Fieldpiece remained the exclusive provider of infrared leak detectors using the Patented Technology and is not entitled to any lost profits.

      **2.**     **If An Implied License to Inficon Existed It Was Not For The Patented Technology:**

Under the Business Agreement, Fieldpiece had an exclusive license to sell products covered by the '993 Patent *and* the '088 Patent in the HVAC/R market.   Even assuming, *arguendo*, that the covenant not to sue contained in the Settlement Agreement with Inficon was an implied license, the evidence in this case was that the '088 Patent and all but 5 out of 23 claims of the '993 Patent were invalidated by the Patent Office before the Settlement Agreement/Covenant Not to Sue.   Thus, Inficon did not receive a license to sell products covered by the '088 Patent (it was invalidated) *and* the '993 Patent (it was substantially revised).   In other words, the "license" Inficon received differed substantially from the exclusive license Fieldpiece received and thus there was no breach of the Business Agreement.

      **3.**     **TRE Did Not Breach The Business Agreement- Pre-existing Condition.**

Fieldpiece admitted, and the Pretrial Stipulation 6p acknowledges, Fieldpiece knew that Inficon was selling infrared leak detectors before the Business Agreement was executed. Fieldpiece did not require that TRE sue Inficon to stop them from selling infrared leak detectors in the HVAC market.   There is nothing in the Business Agreement that requires TRE to sue

Inficon, nor is there even a provision requiring TRE to enforce its patents against alleged infringers. Thus, Fieldpiece did not have any reasonable expectation that this pre-existing condition (Inficon's sales of infrared leak detectors to the HVAC market) would change after the Agreement was executed. Accordingly, Fieldpiece cannot assert a breach where it is identical to the pre-existing condition. *See Pride v. Exxon Corp.,* 911 F.2d 251 (9th Cir. 1990) (failure to alter a pre-existing condition about which plaintiff had knowledge, where there was no reasonable expectation that that would be done, cannot form basis of breach of duty of good faith under contract).

### 4.     Fieldpiece Waived Any Right to Declare Breach.

TRE asserted "waiver" as its first affirmative defense.  "A waiver may be either express…or implied, based on conduct indicating an intent to relinquish the right…. There is a waiver when a 'party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." *Darling Intern., Inc. v. Baywood Partners, Inc*., 2007 WL 2088366 (N.D. Cal. 2007) (internal citations omitted) (holding that plaintiff had "engaged in conduct which induced in (defendant) a reasonable belief that plaintiff had waived its right to contract termination"). In *Rolling v. E\*Trade Sec. LLC,* 860 F. Supp. 2d 1035 (N.D. Cal. 2012), the court stated:

> Under both New York and California law, when a plaintiff has knowledge of the defendant's breach and continues to perform under the contract and/or accepts the defendant's performance without notifying the defendant of the breach, a waiver is fairly implied.

*Id*. (customer waived right to challenge practice of charging fee by continuing to perform under their agreements, precluding breach of contract claim).

11

In an email to Mr. Williams in November 2009, in response to Mr. Williams advising that the Inficon lawsuit was settled, Mr. Harju merely asked about the royalty that Inficon would be paying to TRE.  He wanted to ensure that Inficon would not have a competitive advantage in selling its infrared leak detectors.  Notably, Mr. Harju did not object to Inficon's purported right to sell products using the Patented Technology (a right he anticipated Inficon had received as a result of the patent infringement lawsuit having been settled).  Then, in two emails to his supplier Daphne at CHY, dated October 25 and October 30, 2012, Mr. Harju again stated that he was aware that TRE had settled its lawsuit against Inficon, and that he, Mr. Harju, was only concerned that Inficon was not paying a lower royalty than Fieldpiece was paying for the right to sell products using the Patented Technology.  Thus, with knowledge of the alleged breach, Fieldpiece continued to perform the Business Agreement and accepted TRE's performance without ever notifying TRE of a breach.  This constitutes a waiver under California law.  *See Rolling, supra; Leiter v. Eltinge*, 246 Cal. App. 2d 306, 317-18 (Cal. Ct. App. 1966).

Fieldpiece may argue that the Business Agreement states that "waiver of one default hereunder shall not constitute the waiver of any subsequent or continuing default." But TRE's alleged supplying of the Patented Technology to Inficon would not be a "default" – it would be a "breach."  The Business Agreement does not define either of these terms, but Black's Law Dictionary does.  "Default" is the "omission or failure to perform a legal or contractual duty." *Black's Law Dictionary* 184 (2nd pocket ed. 2001).  In comparison, a "breach" is a "violation or infraction of a law or obligation."  *Id.* at 76.  The conduct alleged by Fieldpiece that TRE supplied the Patented Technology to Inficon is not a "failure to perform," but rather an alleged "violation" of the contractual obligation to maintain Fieldpiece's exclusive license.  Thus, the Business Agreement does not prevent Fieldpiece from waiving TRE's alleged breach.

4827-3172-5084.1_37023/0003 NCV ncv

Moreover, the alleged breach would not be "subsequent or continuing" default, because it was one act – entering into the Settlement Agreement.

### 5.   Even If The Court Found That TRE Breached the Business Agreement, Fieldpiece Failed to Mitigate Damages.

A plaintiff who suffers damage as a result of a breach of contract "has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided." *Valle de Oro Bank v. Gamboa*, 26 Cal. App. 4th 1686, 1691 (Cal. Ct. App. 1994).   An exclusive licensee has a right to enforce against potential infringers the patents it licenses. See *Weinar v. Rollform Inc.,* 744 F.2d 797, 806 (Fed. Cir. 1984).   In April 2014, Fieldpiece sent a cease and desist letter to Bacharach and two other companies that it believed were selling products using the Patented Technology.   Yet Fieldpiece did not send a cease and desist letter to Inficon, and took no action, in the face of continuing Inficon sales, to assert its alleged exclusive rights.   Thus, Fieldpiece failed to mitigate its damages and cannot now recover from TRE.

### 6.   Fieldpiece's Did Not Prove Damages

The measure of damages for breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Cal. Civ. Code § 3300.   "The measure of damages is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." *ProMex, LLC v. Hernandez,* 781 F. Supp. 2d 1013, 1018-19 (C.D. Cal. 2011) (internal citations omitted).

4827-3172-5084.1_37023/0003 NCV ncv

Specifically regarding lost profits, as alleged here, "[i]t has long been settled in California that the proof must establish with ***reasonable certainty and probability*** that damages will result in the future to the person wronged." *Id.* (citations omitted; emphasis added).  Moreover, "[i]t is generally improper . . . to measure damages by the gain to the Defendants, rather than the loss to the Plaintiffs." *ProMex, LLC v. Hernandez,* 781 F. Supp. 2d 1013, 1018-19 (C.D. Cal. 2011). "Defendants' profits cannot be directly correlated to Plaintiffs' loss above the speculative level." *Id.* (Plaintiffs' evidence solely based on an undisputed figure of Defendants' profits is improper).

The testimony provided by Mr. Ault was wholly improper and speculative.  Fieldpiece did not **"supply the 'relevant data'** from which an estimate of the amount lost-sales damages can be based."  *In re TFT-LCD (Flat Panel) Antitrust Litig.,* 2012-2 Trade Cases P 78066 (N.D. Cal. 2012) (granting summary judgment on Costco's lost-sales claims when long time employees with "'decades of experience in assessing LCD product prices and sales volumes at Costco' is a damages expert" and not "suited to provide competent, non-speculative lay testimony on the esoteric subject of Costco's alleged 'lost sales' damages).

Even if the Court were inclined to give any weight to Mr. Ault's testimony or give any credence to his "methodology", Mr. Ault does not have a list of the distributors he went to, the dates, the quantities of which products from what brand he observed, and how he otherwise came up with whatever figures he purports to have.

Mr. Ault's testimony is also **based on speculation and guesswork**.  The Costco court rejected Costco's argument that the witnesses would testify on the "simplicity of the Costco business model and long-observed relationships between prices and volumes [this was a case where Costco asserted a price-fixing conspiracy]."  Thus, even if Mr. Ault has 'long-observed' the relationships between the volumes of Inficon sales and FP's lost sales (which it does not have

evidence of), there is no reliable methodology or calculation that he has used to apply what he observed or his personal experience or knowledge to. Fieldpiece has "no expert methodology, calculation, or other evidence of any lost sales damages," which is required to prove lost profits with reasonable certainty. *See id.*

The Costco court went on to state that even if the witnesses could provide non-speculative lay opinion testimony, Costco has "provided no evidentiary or experimental basis to estimate either the volume of Costco's additional LCD Product sales in a "but for" world, or the profit margin on such sales." *See id.*

"Rule 701 requires that the opinion be "rationally based on the perception of the witness." Fed.R.Evid. 701. In the damages context, an owner must show how his personal knowledge of the operating history of the business is sufficient to support his proffered testimony regarding projected lost profits. *See Lifewise,* 374 F.3d at 930; *KW Plastics,* 131 F.Supp.2d at 1273-74; *see also Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 265 (2d. Cir.1995) (holding that a company president could testify to projected lost profits when they were based on evidence of decreased sales). A Rule 701 witness cannot simply assert conclusions, but must provide an adequate foundation. *See supra* Part II.B. Otherwise, such testimony will not be helpful to the trier of fact as is required by Rule 701." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.,* 2:04-CV-08-BES-LRL, 2006 WL 5242377 (D. Nev. 2006).

Moreover, Fieldpiece could not possibly show that each and every Inficon sale would have gone to Fieldpiece. Indeed, Mr. Harju testified that leak detectors using ionization technology are almost as good as those using infrared, and Inficon sold at least five ionization leak detectors. Thus, it is more probable that Inficon, had it been prevented from selling infrared leak detectors, would have sold its customers ionization leak detectors rather than losing those

15

sales to Fieldpiece. Or, as Mr. Harju admitted, Inficon, like a car dealer prohibited from selling its premium model, would have simply designed around the patent and come up with a new premium model.    Any assumption that Fieldpiece would have gained Inficon's lost sales of infrared leak detectors is pure speculation.

Fieldpiece failed to provide any evidence on other key factors.  For example, Fieldpiece never provided evidence that it had the manufacturing capacity to supply infrared leak detectors to all of the customers who ended up buying their products from Inficon.  Nor has Fieldpiece provided any evidence concerning its marketplace share, or the effect on the market if Inficon was unable to sell infrared leak detectors.  Basing Fieldpiece's damages solely on Inficon's profits is "too speculative, and as a result, improper." *See Sebastian Intern., Inc. v. Russolillo*, 2005 WL 1323127 (C.D. Cal. 2005) *citing Thompson v. Haynes,* 305 F.3d 1369, 1382 (Fed.Cir.2002) (holding that where the plaintiff was unsure of the amount of its lost profits and could not prove that any lost profits were the result of the defendant's sale of "pirated" products, the district court erred in awarding lost profits, because although the amount of damages can be estimated, it cannot be "merely speculative") (citations omitted).

Fieldpiece also does not have a damages expert for its $3 million + damages claim, let alone consider any external variables that could impact profitability.  "In a lost profits analysis an expert is required to opine as to what would happen in a hypothetical market—a market without the Defendants' infringement." *Go Med. Indus. Pty, Ltd. v. Inmed Corp.,* 300 F. Supp. 2d 1297, 1317 (N.D. Ga. 2003) *aff'd sub nom. Go Med. Indus. Pty., Ltd. v. Inmed Corp.,* 471 F.3d 1264 (Fed. Cir. 2006).

In the context of patent infringement claims, which may be analogous to this case, in order to prove lost profits, the patent owner must demonstrate that there was a reasonable probability

that, but for the infringement, it would have made the infringer's sales." *State Indus., Inc. v. Mor–Flo Indus., Inc.,* 883 F.2d 1573, 1577 (Fed.Cir. 1989). "The 'but for' inquiry requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee" would have made. *Grain Processing Corp. v. Am. Maize–Products Co.,* 185 F.3d 1341, 1350 (Fed.Cir. 1999). "To prevent the hypothetical from lapsing into pure speculation, [the] court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Id.*

The Federal Circuit has stated that a useful, but non-exclusive, way for a patentee to prove entitlement to lost profits is the *Panduit* four-factor test: The *Panduit* test requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made. *Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1545 (Fed.Cir. 1995) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir. 1978)).

A patentee seeking to prove that "it lost sales *equal in quantity* to the infringing sales" must typically show, among other things, the "absence of acceptable noninfringing substitutes" within the market. *See Water Techs. Corp.,* 850 F.2d at 671–72 (discussing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152 (6th Cir.1978)). Mr. Harju himself testified that Inficon's product did not infringe TRE's patents. Therefore, Inficon's product is a non-infringing substitute in the market.

And the evidence also showed that Inficon sells at least five leak detectors using ionization technology, which Mr. Harju admitted is almost as good as infrared technology.

       "[A] fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the

17

> infringer foreseeably would have undertaken had he not infringed. Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether. The competitor in the 'but for' marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner."

*Grain Processing Corp. v. Am. Maize-Products Co.,* 185 F.3d 1341, 1350-51 (Fed. Cir. 1999). Thus, even under the analogous patent damages cases, Fieldpiece did not prove that Inficon in the "but for" marketplace would have merely surrendered its market share if it could simply compete using its other leak detector products.  It would require the Court to make a quantum leap to conclude that each sale by Inficon is a lost sale to Fieldpiece.

"In the absence of any sound evidence respecting, *inter alia,* Plaintiffs' market share, the Court is simply left without the evidentiary foundation necessary to arrive at even a reasonably close approximation of Plaintiffs' lost profits."  *Keg Technologies, Inc. v. Laimer*, 436 F. Supp. 2d 1364, 1370 (N.D. Ga. 2006); *see also Hughes Tool Co. v. G. W. Murphy Indus., Inc.,* 491 F.2d 923, 930 (5th Cir. 1973) ("Without some firm basis for determining the relevant market, we cannot explore further the merits of the market-share contention. And with no definite market, clearly the variables are too many and the speculative nature of lost profits too great to form a basis for recovery.").

### 7.    Fieldpiece's Cannot Prove It's FDUPTA Claim

In order to sustain a claim for damages under FDUTPA, a claimant must prove three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006); *see also Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1292 (M.D. Fla. 2009).

### a. *The Alleged Unfair Practice or Deceptive Act Did Not Occur*

The Counterclaim alleged that "TRE supplied its patented technology to competitors of Fieldpiece despite granting Fieldpiece the exclusive right thereto" (D.E. 51, ¶ 25) and that this "conduct constitutes deceptive and unfair trade practices."  (D.E. 51, ¶ 26.) But there was no evidence that TRE supplied its Patented Technology in the HVAC market to anyone other than Fieldpiece.

Nor were any statements made in the November 6, 2009 email from Mr. Williams to Mr. Harju violative of the FDUTPA.  First, Fieldpiece never pled this theory in its Complaint and thus it cannot be considered by the Court. *See Dorestin v. Hollywood Imports, Inc.,* 45 So. 3d 819 (Fla. 4th DCA 2010) (holding that trial court should have entered judgment notwithstanding verdict in defendant's favor because plaintiffs' claim jury ruled on was never pled as one of the deceptive acts that defendant allegedly committed).

Moreover, one allegedly misleading email is not a deceptive "trade practice."  Nor was Fieldpiece "deceived" by the email; it knew that Inficon continued to sell the infrared product in the HVAC market. The email did not create any "representation, omission, or practice" by TRE that was likely to mislead Fieldpiece and was not unfair to Fieldpiece, since no circumstances changed by virtue of TRE signing the Settlement Agreement or from TRE's representations in the email.

### b. failure to perform a contract does not give rise to a FDUTPA claim

Fieldpiece's FDUTPA claim also fails because the conduct complained of by TRE is not, as a matter of law, actionable under FDUTPA. The simple breach of contract, standing alone, will not support a FDUTPA claim. *See Rebman v. Follett Higher Education Group, Inc.*, 575 F.Supp.2d 1272, 1279 (M.D. Fla. 2008). In order for a breach of contract to support a FDUTPA

19

claim, the underlying act giving rise to the breach must also constitute an unfair and deceptive trade practice. *Id.* FDUTPA "does not operate to convert every breach of contract or breach of lease case into a claim under the Act. Indeed, such a construction would be precluded by the FDUTPA, which only reaches conduct that is unfair or deceptive as judged by controlling case law." *PNR, Inc., v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 n.2 (Fla. 2003). The mere failure to perform under a contract is not, by itself, an unfair and deceptive trade practice. *See Bookworld Trade, Inc., v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007).

Entering into the Settlement Agreement did not create a "representation, omission, or practice" by TRE *to Fieldpiece* that was likely to mislead Fieldpiece. Similarly, the representations in the email did not deceive Fieldpiece because Fieldpiece already knew that Inficon was continuing to sell its product in the HVAC market, it was only concerned that it wasn't paying a higher royalty than Inficon.

### c.   Lost profits not recoverable under FDUTPA

To prove a violation of FDUTPA, Fieldpiece must prove that it suffered actual damages. Fla. Stat. § 501.211. "Actual damages" has been narrowly defined by Florida courts. *See, e.g., Orkin Exterminating Co. v. Petsch,* 872 So.2d 259, 263 (Fla. 2d DCA 2004) ("special, consequential, and incidental damages" are "not available under FDUTPA"); *Dorestin,* 45 So.3d at 824–25 ("The statute does not allow the recovery of other damages, such as consequential damages."). Significantly, "[i]t remains well-settled in Florida that consequential damages in the form of lost profits are not recoverable under FDUTPA." *Five for Entm't S.A. v. Rodriguez,* 877 F. Supp. 2d 1321, 1331 (S.D. Fla. 2012) *citing QSGI, Inc. v. IBM Global Financing,* Case No. 11–80880, *5, 2012 WL 1150402 (S.D.Fla.2012) (dismissing FDUTPA claim for failure to plead

actual damages, when only lost profits were pled); *Eclipse Med., Inc. v. Am. Hydro–Surg. Instruments, Inc.,* 262 F.Supp.2d 1334, 1357 (S.D.Fla.1999) ("Florida courts specifically reject the recovery of consequential damages under FDUTPA . . .lost profits may indeed be the quintessential example of consequential damages.")

It is undisputed that the only damages Fieldpiece has asserted are consequential damages arising from lost profits related to the Settlement Agreement.  Thus, Fieldpiece cannot recover under FDUTPA.

**5.     CONCLUSION**

WHEREFORE, for the reasons stated above, TRE is entitled to a Final Judgment in its favor and against Defendant Fieldpiece on its Complaint, Fieldpiece should go hence without day on its Counterclaim, and the Court TRE should award TRE its prevailing party reasonable attorneys' fees and costs on Fieldpiece's FDUPTA claim.

Respectfully submitted this 28th day of July, 2014.

> **BROAD AND CASSEL**
> Attorneys for Plaintiff
> 390 North Orange Avenue, Suite 1400
> Orlando, Florida  32801
> Telephone:     (407) 839-4200
> Facsimile:     (407) 425-8377
>
> By:___*/s/ Nicolette C. Vilmos*
> Nicolette C. Vilmos, P.L.
> Florida Bar No. 0469051
> nvilmos@broadandcassel.com
> Matthew Nelles, Esq.
> Florida Bar No. 09245

## <u>CERTIFICATE OF SERVICE</u>

     **I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this 28th day of July, 2014 via CM/ECF Service to: Mark F. Warzecha, Esquire (mfw@legalteamusa.com), Zies, Widerman & Malek, 1990 West New Haven Avenue, Suite 201, Melbourne, Florida 32904.


                    By:   */s/ Nicolette C. Vilmos*
                           Nicolette C. Vilmos, P.L.
                           Florida Bar No. 0469051
                           nvilmos@broadandcassel.com

4827-3172-5084.1_37023/0003 NCV ncv