**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

TWIN RIVERS ENGINEERING
CORPORATION,

        Plaintiff,

v.                                Case No:  6:12-cv-1794-Orl-40TBS

FIELDPIECE INSTRUMENTS, INC.,

        Defendant.

---

## MEMORANDUM OPINION AND ORDER

    This cause is before the Court following a three-day bench trial beginning on July 14, 2014.[1] Having considered the pleadings, evidence, argument, and relevant legal authority, and having made determinations on the credibility of the witnesses, the Court hereby renders its decision on the merits of this case pursuant to Federal Rule of Civil Procedure 52.

## I.    FINDINGS OF FACT

### A.    Background

1.    Plaintiff, Twin Rivers Engineering Corporation ("TRE"), instituted this action against Defendant, Fieldpiece Instruments, Inc. ("Fieldpiece"), alleging breach of contract (Count I) and breach of an oral agreement (Count II). (Doc. 38). Fieldpiece counterclaimed, alleging breach of contract and violations under the

---

[1] The parties have not ordered the transcript of the trial; therefore, references to testimony provided during the trial are based upon the notes prepared by the Court during the course of the trial as aided by the unofficial transcript.

Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). (Doc. 51).

### B.    The Business Agreement

2.    On April 17, 2006, TRE entered into a four-page written Business Agreement with Fieldpiece (hereinafter the "Agreement").   (Joint Ex. 15).   The Agreement provides that TRE owns United States Letters Patents US6,791,088 (hereinafter "088") and US7,022,993 (hereinafter "993") for a handheld leak detector used for detecting the presence and concentration of selected gaseous substances.   (*Id.* ¶ 1(c)).   The Agreement provides that TRE desired to enter the business of selling infrared (hereinafter "IR") leak detectors in the automotive market.   (*Id.* ¶ 1(d)).   Pursuant to the Agreement, Fieldpiece is in the business of selling hand held instruments for the Heating, Ventilation, Air Conditioning and Refrigeration market (hereinafter "HVAC/R") and desired to obtain licenses from TRE to manufacture and sell IR detectors covered by TRE's patents.   (*Id.* ¶¶ 1(e)–(f)).

3.    The Agreement states that Fieldpiece shall pay TRE one dollar ($1) for an exclusive license to sell products covered by the patents in the HVAC/R market. (*Id.* ¶ 2(g)). In lieu of paying a royalty, TRE agrees to supply Fieldpiece or its supplier a custom integrated circuit suitable for use in a hand held leak detector at a mutually agreeable price and based on commercial considerations in conformance with the California Uniform Commercial Code. (*Id.* ¶ 2(h)).

4.    Pursuant to the Agreement, TRE promises to help Fieldpiece sell IR detectors to the HVAC/R market.   (*Id.* ¶¶ 2(b)–(c)).   The Agreement also states that if TRE wishes to sell IR leak detectors to the automotive market through

Fieldpiece, TRE shall do so exclusively. (*Id.* ¶ 2(d)).   The Agreement further sets forth Fieldpiece's duties and responsibilities to support TRE in the event TRE enters the leak detector automotive market.   (*Id.* ¶¶ 2(e)–(f)).

5.     Fieldpiece also agrees to support TRE's efforts in selling IR leak detectors in the automotive market by performing mutually agreed upon commercial functions at a reasonable, mutually agreed upon price.   (*Id.* ¶¶ 2(i)–j)).

6.     The Agreement addresses termination of the Agreement relative to the HVAC/R market, providing that the licenses according to the Agreement shall terminate upon expiration of the patent for any reason. (*Id.* ¶ 2(g)(ii)). The Agreement otherwise does not provide a date of termination.

7.     The Agreement is silent in terms of when and how the agreement to assist TRE in the automotive IR leak detection market may be terminated and does not provide a date of termination.

8.     The Agreement provides that it may be amended only in writing, duly executed by both parties.   (*Id.* ¶ 2(n)(ii)).   The Agreement is silent as to whether a separate oral agreement had been entered into prior to execution of the written Agreement

9.     In paragraph 22 of Defendant Fieldpiece's Amended Answer, Fieldpiece admits that:

> TRE and Fieldpiece entered into a separate oral agreement in 2006, whereby Fieldpiece agreed to allow TRE to use a mold designed and paid for by Fieldpiece that would house TRE's infrared leak detectors that are sold in the automotive market (hereinafter referred to as the "Automotive Mold"), as well as at least ten other Fieldpiece products, some of which existed long before the leak detector.

(Doc. 51, ¶ 22).

10.     The president of Fieldpiece, Mr. Rey Harju, testified on July 14, 2014 that the

written Agreement incorporated numerous prior conversations between himself

and Mr. Bill Williams, the owner of patent 088 and 993.   Mr. Harju further

testified that Fieldpiece had not entered into a separate oral agreement with

TRE relative to the IR automotive market. This testimony is inconsistent with

Fieldpiece's Amended Answer in which Fieldpiece admits to entering into a

"separate" oral agreement the same year the Business Agreement was

executed. (*See id.*).

### C.     The Inficon Patent Infringement Litigation

11.     On December 7, 2006, TRE filed suit against Inficon, Inc. (hereinafter "Inficon")

in the Middle District of Florida, alleging Inficon's hand-held IR detection device

infringed upon patent 088 and 993.   (Doc. 127, pp. 10–11).   In response to

the patent infringement lawsuit, Inficon filed for reexamination of patent 088

and 993 with the United States Patent and Trademark Office (hereinafter

"PTO"). (*Id.*).

12.     On June 29, 2010, the PTO invalidated patent 088. (*Id.*; Pl. Ex. 59).

13.     At trial, on July 15, 2014, Mr. Bill Williams, the inventor of patents 088 and 993,

testified that, as a result of the re-examination, the PTO reduced patent 993

from twenty-three claims to only five claims, and two new claims were added

to the patent.[2]   (Pl. Ex. 60).

---

2.  Claims define the limits of the invention and serve to set the bounds for the patentee's
rights. In *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), the U.S.
Supreme Court held that "[t]he limits of a patent must be known for the protection of

14.   On November 2, 2007, the Inficon patent infringement lawsuit was dismissed by TRE. (Def. Ex. L). The litigation was dismissed without prejudice due to the patent re-examination by the PTO. (*See id.*).

15.   On October 22, 2009, TRE entered into a settlement agreement with Inficon wherein TRE granted to Inficon and all of Inficon's affiliated companies, a covenant-not-to-sue with respect to patents 088 and 993.  (*Id.*, p. 2, ¶ 3). TRE further granted Inficon and its affiliated companies a covenant-not-to-sue for infringement of any patents based upon any infrared gas analyzers or leak detectors, including, but not limited to, D-TEK brand products.  (*Id.* ¶ 4). The settlement agreement with Inficon was entered into before the PTO issued its findings upon re-examination of patents 088 and 993 but after TRE and Fieldpiece had entered into the Business Agreement.

16.   Mr. Harju testified that he was not aware of any evidence showing that TRE voluntarily provided Inficon with the technology covered by patents 088 and 993 or that TRE assisted Inficon in designing, manufacturing, or selling hand-held IR leak detectors in the HVAC/R market.   Mr. Harju admitted that Inficon had been in the leak detector market long before Fieldpiece entered the market.

17.   Mr. Harju also testified that he knew Inficon was selling IR detectors before entering into the Business Agreement with TRE in 2006. He described Inficon as the "big guy" in the leak detection market and stated that Fieldpiece is, by comparison, "small potatoes."

---

the patentee." (quoting *Gen. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 369 (1938) (internal quotation marks omitted)).

18.     In November 2007, Mr. Harju wrote to Mr. Williams, the patent owner, asking

him the amount of the royalty payments he was collecting from Infincon. (Joint

Ex. 7; Pl. Exs. 22, 97).   This inquiry was repeated on at least one more

occasion directly to TRE and also to CHY.[3]  (*Id.*).

19.     Mr. Harju agreed that the exclusivity provided for in the Business Agreement

only pertained to technology covered by patents 088 and 993.    In his

deposition testimony, given in November 2013, Mr. Harju testified he did not

believe that Infincon was using the patented technology provided by patents 088

and 993.

### D.     Termination of the Agreement(s)

20.     On October 11, 2012, Mr. Rey Harju, the president of Fieldpiece, sent an email

to Mr. Williams, the patent owner and president of TRE, stating the following:

> Bill – Our agreement with you regarding SPX is over.   SPX is
> in Europe chasing HVAC business we developed, using lower
> prices to get [sic] take the business.   As I've told you before,
> this is not good.   We have rescinded approval to ship
> products to SPX using our proprietary plastic and other
> electrical, electronic, and mechanical components. – Rey.

(Doc. 127, p. 11; Joint Ex. 2).[4]

21.     Mr. Williams testified that the Business Agreement does not specify an end or

expiration date; therefore, either party may terminate the Agreement at any

time.

---

3.  CHY is the company that assembled the IR detectors using Fieldpiece's automotive
    mold and TRE's patented technology.
4.  On November 27, 2012, TRE sent Fieldpiece written notice that TRE was terminating
    the Business Agreement.   (Doc. 127, p. 11).

22.   Mr. Harju testified at trial on July 14, 2014, that the October 11, 2012 email terminating the agreement to supply molds for IR leak detectors used in the automotive industry was prompted by Fieldpiece having become aware that a company called SPX was presenting IR hand-held lead detectors at an HVAC/R conference.   Mr. Harju testified that SPX was supplying IR detectors using TRE's patented technology and Fieldpiece's molds for use in the automotive industry, an agreement to which Fieldpiece had no objection. (Pl. Exs. 11, 16).   However, Mr. Travis Ault, a Fieldpiece officer, testified on July 16, 2014, that he observed SPX displaying IR leak detectors at an HVAC/R convention in Europe in direct violation of the Business Agreement, which gave Fieldpiece the exclusive license to sell products employing TRE's patented technology in the HVAC/R market.

23.   After Mr. Harju notified TRE that the agreement to supply the automotive molds had been terminated, he instructed CHY, the company that assembled the IR detectors using Fieldpiece's automotive mold and TRE's patented technology, to cease shipping leak detectors to any purchaser other than Fieldpiece. (*See* Pl. Ex. 11).

24.   Mr. Harju acknowledged that he directed CHY to stop supplying IR detectors using the Fieldpiece mold to SPX and that SPX was TRE's primary customer for automotive IR leak detectors.   Mr. Harju testified that he knew TRE had a pending order for ten units on order to CHY when Fieldpiece terminated the Agreement to supply automotive molds on October 11, 2012.   However, Mr. Harju also testified that Mr. Williams informed him that TRE was ultimately able

to meet this order, regardless of Fieldpiece's decision to cease supplying automotive molds to SPX through CHY.

25.   Mr. Harju testified that on December 4, 2012, he sent an email to CHY instructing CHY to fill pending orders for TRE.   This directive was confirmed in an email, and Mr. Williams admitted to having knowledge of Fieldpiece's instruction to CHY to fill TRE's orders.   (Pl. Ex. 27).

26.   Mr. Harju testified that the email of December 4, 2012 was not a re-affirmation that the Business Agreement, or separate oral agreement, continued to be in effect, but was an attempt to allow TRE to mitigate their damages by filling any pending orders.

27.   Mr. Williams testified that TRE did not directly supply SPX with IR leak detectors.   Mr. Williams stated that SPX places orders through a broker who then orders the units from CHY.   Mr. Williams explained that TRE did not directly supply SPX with IR detectors for use in the HVAC/R market and did not condone CHY having supplied these units.   Moreover, Mr. Williams testified that he instructed CHY not to supply SPX with the patented technology for use in the HVAC/R market.   Mr. Williams also explained that the patents for the IR leak detection technology are limited to the United States, and SPX's European division was selling IR detectors in the European HVAC/R market.

28.   On cross-examination, Mr. Williams acknowledged that TRE had given Fieldpiece a worldwide exclusive license to sell the IR leak detectors in the HVAC/R market, and that TRE could enforce that license by filing suit in Europe even though the patents were limited to the United States.   By way of

clarification, Mr. Williams testified that the Business Agreement does not impose upon TRE the duty to file suit to enforce the exclusivity provision. This point was not controverted by Fieldpiece. In fact, Mr. Harju agreed that TRE was not required to file suit to protect the exclusivity.

### E.    Patented Technology and Third Party Violations of Exclusivity

29.    As discussed herein, in Fieldpiece's counterclaim, Fieldpiece contends that TRE breached that section of the Agreement that pertains to TRE providing Fieldpiece an exclusive license to sell IR leak detectors in the HVAC/R market utilizing technology covered in patents 088 and 993.   The "Breach of Contract" claim alleges that TRE breached the Agreement by supplying "its patented technology to third parties in violation of Fieldpiece's exclusive right to sell infrared leak detectors that include TRE's patented technology."   (Doc. 51, ¶ 22).

30.    Mr. Harju admitted that the exclusive right to sell IR leak detection products provided by TRE to Fieldpiece is limited to patents 088 and 993 as they existed at the time the Business Agreement was executed in 2006. That is, if the integrated chip technology used by third parties in the fabrication of IR leak detectors does not employ the technology patented by 088 and 993, Fieldpiece has no right to assert a breach of the Agreement.

31.    Fieldpiece elected not to present evidence through an expert witness to establish that the hand-held IR leak detection technology employed by SPX in the HVAC/R market was the same technology that is defined in patents 088 and 993.

32.    There is no record testimony that the IR leak detectors sold by SPX in Europe contain the patented technology covered by patents 088 and 993.   It is clear that CHY provided SPX Europe with integrated chips created by TRE and that the chips were integrated into hand-held IR leak detectors for use in HVAC/R market. However, there is no competent evidence that the integrated chips supplied by CHY and used by SPX are covered by patents 088 and 993.

33.    The evidence presented at trial regarding sales of IR leak detectors by SPX Europe comes from Mr. Harju and, specifically, an email dated October 24, 2012.   (Joint Ex. 11).   The email references 600 IR leak detector units sold by SPX in 2011 and 500 units ordered from CHY since June 2012.   That is, the evidence is limited to IR units containing TRE integrated chips in the years following 2010, and in 2010, the PTO invalidated patent 088 and substantially limited the claims in patent 993.   No testimony was presented to establish that the SPX leak detectors sold in or around 2011 and June 2012 contained the "same" patented technology that is the subject of the Business Agreement.

34.    Similarly, Fieldpiece chose not to call an expert witness to testify that the IR leak detection technology used by Inficon in the HVAC/R market subsequent to TRE and Inficon entering into a settlement containing a covenant-not-to-sue was the same technology as defined in patents 088 and 993.   Fieldpiece attempted to use lay witness testimony to establish that the technology used by Inficon between 2009 (the date of the covenant-not-to-sue), and either October 11, 2012 (the date Fieldpiece terminated the Agreement relative to automotive molds) or November 27, 2012 (the date TRE terminated the

Business Agreement), was the same as the technology defined in patents 088 and 993.  The proffered lay witness testimony was completely lacking in credibility and fails to establish that the technology used by Inficon following the October 22, 2009 settlement agreement (Def. Ex. L) was the same as the technology covered by patents 088 and 993 as they existed on April 17, 2006 (Joint Ex. 15).

35.    Mr. Frank Baker, the former general manager of TRE, testified that TRE sued Inficon for patent infringement because TRE believed Inficon infringed upon the 088 and 993 patents.  Mr. Baker also testified that he had no idea whether Inficon detectors incorporated the remaining 993 technology as it existed post-re-examination by the PTO following the settlement agreement with Inficon.

36.    Mr. Williams, the creator of the patent, testified that prior to filing the infringement lawsuit against Inficon, he disassembled an Inficon IR leak detector and concluded that it infringed upon 088 and 993.  However, Mr. Williams testified that he has not disassembled an Inficon IR detector between October 22, 2009 (the date of the covenant-not-to-sue), and November 27, 2012 (the date TRE terminated the Agreement with Fieldpiece). Accordingly, Mr. Williams could not say whether Inficon's IR detector used patent 088 or 993 technology as it existed before the PTO declared 088 invalid and substantially modified 993.  Similarly, he could not opine whether Inficon utilized what remained of 993 following the PTO's modification of that patent.

37.    Finally, Fieldpiece called Mr. Travis Ault in an attempt to demonstrate that Inficon's IR leak detectors violated the exclusivity provision of the Agreement.

Mr. Ault holds a bachelor's degree in systems engineering and a master's degree in business administration.   At Fieldpiece, Mr. Ault was responsible for the finance department, quality assurance, and product development.   Mr. Ault did not design the subject IR leak detector for use in the HVAC/R market.

38.   Mr. Ault acknowledged that he is not an electrical engineer, and he admitted that electrical engineers have different training than systems engineers.   Mr. Ault testified that in either 2008 or 2009, he disassembled an Inficon IR detector sold in the HVAC/R market.   Mr. Ault also testified that the Inficon IR detector appeared to be the same as the IR detector sold by Fieldpiece and used the TRE patented technology.   However, Mr. Ault did not prepare any notes of his findings, did not videotape or photograph the subject Inficon unit, and admitted that he inspected the Inficon unit in an attempt to ascertain why Fieldpiece's IR detectors were registering a false reading.   That is, his analysis of the Inficon unit in 2008 or 2009, which is prior to the PTO completing its re-examination, was not for the purpose of determining whether Inficon was violating the exclusive license to sell IR detectors in the HVAC/R market that had been conveyed to Fieldpiece by TRE in 2006.

39.   Mr. Ault further testified that in late 2012 or early 2013, he looked at another Inficon unit, after he learned that TRE had settled the patent infringement suit with Inficon. Again, Mr. Ault did not prepare any notes or reports of his findings, nor did he videotape or photograph the Inficon unit.   Mr. Ault testified that the unit he disassembled in late 2012 or early 2013 appeared to be the same as the Fieldpiece IR detectors.   Mr. Ault did not disassemble any Inficon units in

2010, 2011, or prior to October or November 2012, when Fieldpiece and, thereafter, TRE terminated the Agreement(s). Therefore, he could not and did not testify that Inficon was using the TRE patented technology, or what remained of it, that is the subject of the Business Agreement.

### F.    Deceptive and Unfair Trade Practices

40.    Fieldpiece alleges in its counterclaim that TRE "supplied its patented technology to competitors of Fieldpiece despite granting Fieldpiece the exclusive right thereto." (Doc. 51, pp. 12–13). Fieldpiece asserts that this conduct constitutes "deceptive and unfair trade practices" in violation of Fla. Stat. §§ 501.201–.213. (*Id.* ¶ 26).

41.    At trial, Fieldpiece relied upon an email from Mr. Williams dated November 6, 2009 as evidence of a deceptive act, wherein Mr. Williams tells Mr. Harju, "The Patent Law suit against Inficon has been settled, we retained our Patents!! This will keep all interlopers out of the infrared product business." (Joint Ex. 7, p. 3).

42.    Contrary to the representations contained in the above email, the settlement agreement entered into between TRE and Inficon on October 22, 2009 gave Inficon a covenant-not-to-sue for "infringement of any patents based upon any infrared gas analyzers or leak detectors, including, but not limited to, D-TEK brand products." (Def. Ex. L, ¶ 4). In return, TRE was paid $200,000 by Inficon. (*Id.*). The settlement agreement entered into between TRE and Inficon cannot be fairly construed as TRE having retained their patents. To the contrary, TRE effectively gave Inficon a license to use its patent without

fear of repercussion. Rather than fending off interlopers, TRE had licensed Inficon, a competitor of Fieldpiece, to use IR detection technology in the HVAC/R market.

43.   To the extent that Fieldpiece's Deceptive and Unfair Trade Practices claim rests upon a finding that TRE "supplied its patented technology to competitors of Fieldpiece," the evidence regarding the similarity, or lack thereof, is set forth Sections I.C and I.D of this opinion, *supra*.

### G.   Damages Claimed by Fieldpiece

44.   At trial, Fieldpiece called Mr. Travis Ault to testify regarding damages allegedly sustained by Fieldpiece as a result of TRE's alleged breach of the exclusivity clause of the Business Agreement.   Mr. Ault testified that Inficon would not be competing in the IR leak detection HVAC/R market in the absence of TRE's covenant-not-to-sue Inficon.   Mr. Ault and Mr. Harju testified that the TRE-Inficon settlement is tantamount to TRE providing Inficon a license to use TRE's integrated chip technology and thereby violates the exclusivity provision of the Business Agreement.

45.   Mr. Ault acknowledged that Inficon is a substantially larger corporation than Fieldpiece and that Inficon has been a major force in the HVAC/R leak detection market for considerably longer than Fieldpiece and is entrenched in the market. Mr. Ault offered no testimony to support the notion that Inficon— assuming Inficon is using the patented technology which is the subject of the Agreement—could not simply design around what remains of patent 993 to continue to compete in the IR leak detection market.

46.   Similarly, Mr. Ault testified that Fieldpiece is a relatively small company, while Inficon is exponentially larger and is more widely entrenched with its customer base.   Mr. Harju testified that Inficon owns the leak detection marketplace. Neither Mr. Ault nor anyone from Fieldpiece offered testimony that if Inficon had been excluded from the IR hand-held leak detection market that Fieldpiece could have processed the volume of orders previously filled by Inficon that Fieldpiece claims it lost as a result of TRE's settlement with Inficon.   The record is also devoid of evidence that Inficon's customers would have switched to Fieldpiece instead of switching to a heated diode leak detector which Inficon sells and which Mr. Harju described in deposition as being almost as good as the infrared leak detectors.

47.   Mr. Ault testified that as part of his routine business responsibilities, he met with distributors and sales representatives to reaffirm relationships with his customers and to educate customers about new products.   Mr. Ault estimated that he visited a few hundred distribution centers—out of a total of 4,500 centers—and compared the presence of Fieldpiece leak detectors to Inficon detectors on the shelf.   Mr. Ault also examined Fieldpiece's records and determined that Fieldpiece sold 11,776 IR leak detectors from October 2009 until November 2012. He estimated, based upon his site visits, that Inficon was selling two to three times that volume of IR detectors.

48.   On cross-examination, Mr. Ault admitted that he did not prepare reports documenting the volume of competing IR detector products on the shelves and he could not render an opinion as to the volume of Inficon IR detectors sold

during any given period of time.

### H.   Damages Claimed by TRE

49.   Mr. Williams testified that TRE lost profits in the automotive IR leak detection market when Fieldpiece stopped supplying molds to TRE through CHY.   One element of damage sought by Mr. Williams and TRE is the costs incurred in designing and fabricating a mold for use with the hand-held IR leak detectors used in the automotive market. TRE presented invoices and testimony in support of their contention that designing and fabricating a new automotive mold cost TRE $125,000.00.   (Pl. Ex. 33–40).

50.   Contrary to the contention that TRE was forced to fabricate a new automotive mold due to Fieldpiece's termination of the Agreement, Mr. Williams testified that TRE began the process of making their own automotive mold before Mr. Harju sent the email to Mr. Williams on October 11, 2012.   Mr. Williams stated TRE was motivated to make their own automotive mold because Fieldpiece had created another IR detector that was competing with TRE's product and which looked similar to the TRE product, thereby creating confusion among TRE's customers.

51.   Mr. Frank Baker, TRE's general manager, testified that TRE also began working on their own mold, in part, to become more independent from Fieldpiece.   Mr. Baker also testified that TRE intended to make changes to the mold as early as June 2012, three months prior to Fieldpiece's October 11, 2012 email.

52.   TRE also claims that they lost the ability to fulfill substantial orders for IR leak

detectors which they anticipated receiving from automotive manufacturers, including Chrysler.   Mr. Williams testified that TRE lost $535,000.00 in gross sales due to Fieldpiece terminating the oral agreement in October 2012.

53.   TRE offered Requests for Quotes (hereinafter "RFQ") as evidence of lost profits. (Pl. Ex. 44, 45).   Mr. Williams testified that TRE received RFQs from automotive manufacturers which put TRE on notice of upcoming orders to assist TRE in meeting production needs.   Mr. Williams testified that Plaintiff's Exhibit 44 reflects an order for 3,000 IR leak detectors from Chrysler, and Plaintiff's Exhibit 45 reflects an order for 1,000 units from Honda.   On cross-examination, however, when confronted with the fact that 4,000 units multiplied by the sales price of $190.12 per unit results in $760,480.00, Mr. Williams admitted the RFQs are inconsistent with TRE's alleged lost profits of $535,000.00.   During cross-examination, Mr. Williams also admitted that the RFQ in Plaintiff's Exhibit 45 was received after Fieldpiece terminated the automotive mold agreement and should be ignored. Under further questioning, Mr. Williams testified that Plaintiff's Exhibit 44 actually reflects an RFQ for 1,500 units, not 3,000, contradicting his testimony on direct-examination.   Mr. Williams testified that the alleged loss of $535,000.00 was proven by Plaintiff's Exhibit 44.   However, 1,500 units multiplied by the sales price is $285,180.00 and not $535,000. As a result, the RFQs offered as proof of lost future profits were shown to be wholly unreliable.

54.   Mr. Williams agreed that in the Second Amended Complaint, TRE was seeking compensation for the loss of 2,800 units subject to an RFQ from Chrysler and

6,100 units subject to a separate RFQ, but he admitted that he did not know where these figures came from and neither figure multiplied by the unit price comes to $535,000.00.

55.   Mr. Williams further testified that TRE did not receive an actual purchase order for the RFQ in Plaintiff's Exhibit 44 because he told the automotive manufacturer that he could not fulfill the order.   When asked why TRE did not take advantage of Fieldpiece's offer to have CHY fill all pending orders, Mr. Williams testified that TRE did not want to dance to Mr. Harju's drummer.

56.   Mr. Baker, a former TRE employee, also testified regarding TRE's alleged damages.   He testified that orders placed by automotive manufacturers, such as General Motors, were placed with SPX and that CHY fabricated the IR detectors using TRE's integrated chips and Fieldpiece's molds.   Mr. Baker testified that RFQs ultimately result in purchase orders. He also testified that SPX was subsequently purchased by Bosch, and Bosch uses a different ordering process then SPX.   Mr. Baker did not clarify when Bosch purchased SPX and how the acquisition impacted, if at all, the RFQ identified in Plaintiff's Exhibit 44.

57.   Mr. Baker testified that the claimed loss of $535,000.00 is determined by multiplying 2,800 units by $190.12 which amounts to projected sales of $532,336.00.   Mr. Baker admitted that Plaintiff's Exhibit 44, the only exhibit offered by TRE to support its claim of damages for lost sales, does not reflect 2,800 units.   Mr. Baker stated that the 2,800 unit figure was provided to him by Mr. Williams, but Mr. Williams testified he had no knowledge of this number.

58. Mr. Backer acknowledged on cross-examination that after TRE terminated the Agreement in November 2012, Fieldpiece had no continuing obligation to supply automotive molds to TRE.

## II.   CONCLUSIONS OF LAW[5]

### A.   Choice of Law

59. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists between the parties and the alleged amount in controversy exceeds the jurisdictional amount. This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

60. A federal court sitting in diversity applies the conflict-of-law rules of the forum state. *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). The forum state in the instant case is Florida. Florida courts generally enforce choice-of-law provisions in a contract "unless the law of the chosen forum contravenes strong public policy." *Walls v. Quick & Reilly, Inc.*, 824 So. 2d 1016, 1018 (Fla. Dist. Ct. App. 2002) (quoting *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000)).

61. Because the Business Agreement contains a California choice-of-law clause and because neither party has asserted that California's law contravenes strong public policy in Florida, the Court interprets the Business Agreement

---

5. To the extent these conclusion of law may represent findings of fact, the Court adopts them as such.

and the alleged oral agreement pursuant to California law.

62.     Under California law, the interpretation of a contract is a question of law for

the trial court's determination. *SDR Capital Mgmt., Inc. v. Am. Int'l Specialty*

*Lines Ins. Co.*, 320 F. Supp. 2d 1043, 1046 (S.D. Cal. 2004).

### B.     TRE's Claims for Breach of Contract and Breach of Oral Agreement Against Fieldpiece

63.     In its Second Amended Complaint, TRE alleges that Fieldpiece breached the

Business Agreement "by failing to provide TRE with the Automotive Mold as

contemplated in Sections 'i' and 'j' of the Business Agreement and confirmed

in an oral agreement and performance by TRE and Fieldpiece." (Doc. 38,

¶ 33).

64.     TRE also alleges that it entered into an oral agreement with Fieldpiece in 2006,

subsequent to entering into the Business Agreement with Fieldpiece, in which

Fieldpiece agreed to allow TRE to use Fieldpiece's mold to house TRE's

infrared leak detectors in the automotive market. (Doc. 38, ¶ 22). TRE alleges

that Fieldpiece breached the oral agreement "by failing to provide TRE with

the Automotive Mold as contemplated in Sections 'i' and 'j' of the Business

Agreement" which is the same breach alleged as to the Business Agreement.

(Doc. 38, ¶ 39).

65.     To state a claim for breach of contract under California law, a party must

establish four elements: (1) the existence of a contract; (2) performance by

that party; (3) breach by the other party; and (4) damage resulting from the

breach. *Alcade v. NAC Real Estate Inv. & Assignments, Inc.*, 316 F. App'x

661, 662 (9th Cir. 2009) (citing *First Commercial Mortg. Co. v. Reece*, 108 Cal. Rptr. 2d 23, 33 (Cal. Ct. App. 2001)) and *Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d. 1094, 1101 (E.D. Cal. 2010).

66.     Where a contract has neither an express nor an implied term of duration, the contract will generally be construed as terminable at will. *See Zee Med. Distrib. Ass'n, Inc. v. Zee Med., Inc.*, 94 Cal. Rptr. 2d 829, 835 (Cal. Ct. App. 2000); Cal. Com. Code § 2106(3) (West 2014). This Court has previously found that the contract was terminable at will. (*See* Doc. 113, p. 12).   Whether the agreement was an oral agreement or a written agreement is a distinction without a difference, in that both the written agreement and the disputed oral agreement were terminable at will.   Pursuant to California law, a contract terminable at will requires the terminating party to provide "the adverse party with reasonable notice thereof." *Mile v. Cal. Growers Wineries, Inc.*, 45 Cal. App. 2d 674, 679 (Cal. Dist. Ct. App. 1941).   The Court finds Fieldpiece provided reasonable notice to TRE of the termination of the agreement to supply automotive molds to TRE, when it sent the email to TRE's president, Bill Williams, on October11, 2012.

67.     To the extent the parties entered into a separate oral agreement in which Fieldpiece agreed to furnish automotive molds to TRE (a fact that was admitted by Fieldpiece in paragraph 22 of its Amended Answer), the Court finds the oral agreement is unenforceable due to lack of consideration.[6] *See*

---

6. Additionally, the Business Agreement provides that "[t]his Agreement may be hereafter amended only in writing duly executed by both partis." (Joint Ex. 15 ¶ n(ii))

*Leonard v. Gallagher*, 235 Cal. App. 2d 362, 373 (Cal. Dist. Ct. App. 1965). Mr. Williams agreed that the consideration for the oral agreement was the same as the consideration supporting the Business Agreement.

68.    "Where a contract is terminable at will, liability attaches [only] for breaches occurring prior to the termination of the contract." *Ravel v. Hubbard*, 112 Cal. App. 2d 255, 259 (Cal. Dist. Ct. App. 1952).

69.    As previously stated, the Court finds that the Business Agreement and any separate oral agreement, to the extent that a separate oral agreement existed, were validly terminated by Fieldpiece on October 11, 2012 in the email sent by Rey Harju to William Williams, which stated, in pertinent part, "Our agreement with you regarding SPX is over." (Joint Ex. 2).   To the extent TRE presented testimony that it did not accept this notice as an actual termination of the Agreement, the Court finds Fieldpiece unequivocally communicated their intention to terminate the Agreement to provide automotive molds for the benefit of TRE and such communication was effective. Mr. Williams admitted at trial that the Agreement lacked a specific expiration date and was subject to termination at will by either party, and the record is clear that TRE received notice of the termination by Fieldpiece.

70.    The Court further finds that subsequent offers by Fieldpiece to allow CHY to fill pending automotive mold orders for TRE does not constitute evidence that the Agreement had not been terminated by Fieldpiece. To the contrary, Fieldpiece's offer to allow CHY to fill pending orders for automotive molds constitutes an offer by Fieldpiece for TRE to mitigate any damages it may

sustain as a result of the termination. TRE elected to reject this offer to avoid dancing to Mr. Harju's drummer.   The Court finds the agreement, whether contained in the Business Agreement or contained in a separate oral agreement, was unequivocally terminated on October 11, 2012.

71.     The Court also finds that, because the Agreement was terminable at will, the email termination by Fieldpiece on October 11, 2012 was proper. Thus, Fieldpiece did not breach the Agreement with TRE. Consequently, because Fieldpiece did not breach the Agreement with TRE, TRE's claim fails and TRE is not entitled to an award of damages for breach of contract.

72.     Having found the termination of the Agreement to have been effective on October 11, 2012, the Court turns to the issue of whether TRE sustained any compensable damages as of that date.   That is, TRE's claim for breach of contract relates only to Fieldpiece's failure to supply TRE the automotive mold on or after October 11, 2012.   As such, TRE is unable to establish any damages after this date, as the Agreement to provide automotive molds was no longer valid, limiting potential damages to sales or orders pending on the date of the termination. *See Ravel*, 112 Cal. App. 2d at 259.

73.     "For the breach of an obligation arising from contract, the measure of damages is the amount which will compensate the party aggrieved for all the detriment proximately cased thereby, or which in the ordinary course of things, would be likely to result therefrom." Cal. Civ. Code § 3300 (West 2014). Damages for breach of contract must be certain. *ProMex, LLC v. Hernandez*, 781 F. Supp. 2d 1013, 1018 (C.D. Cal. 2011) (citing Cal. Civ. Code § 3301)).

74.     When a party seeks to recover lost profits, it must establish proof with "reasonable certainty and probability that damages will result in the future to the person wronged." *Id.* (quoting *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958 (9th Cir. 2011) (internal quotation marks omitted)).

75.     The Court finds the testimony and documentary evidence presented by TRE relative to damages unpersuasive, as discussed in further detail in Section I.G, *supra*.  First, TRE's claim that it incurred $125,000.00 in damages for the design and fabrication of a new automotive mold due to Fieldpiece's "breach" of the Agreement is not credible.   Mr. Williams and Mr. Baker both testified that TRE had taken affirmative steps to create their own automotive mold beginning in June 2012, four (4) months before Fieldpiece terminated the Agreement to provide automotive molds.   Any costs incurred by TRE relative to the design and fabrication of its own automotive mold, to protect its brand and position in the marketplace, is not causally related to Fieldpiece's decision to terminate the Agreement.   To the contrary, TRE was positioning itself to render the services of Fieldpiece redundant and had entered into an agreement with SPX to allow SPX to compete in the HVAC/R market in addition to the automotive market. (*See* Pl. Ex. 65).

76.     The Court also finds that TRE failed to prove by competent and credible evidence that it lost future revenue on sales pending at the time Fieldpiece terminated the Agreement.   The Court finds the testimony of Mr. Williams and Mr. Baker as to the manner in which TRE calculated its lost profits to be based on speculation.   Mr. Williams corrected, modified, and retreated from his

damages calculation numerous times during his testimony.   TRE claimed $535,000.00 in lost profits. Mr. Williams first testified that Plaintiff's Exhibits 44 and 45 reflected RFQs from automotive manufacturers.   Mr. Williams testified that Plaintiff's Exhibit 44 reflected two RFQs for 1,500 unit each. However, 3,000 units multiplied by the purchase price amounted to a number far in excess of the $535,000.00 in alleged lost profits.   When this testimony was proved to be in error, Mr. Williams changed his testimony and stated that Plaintiff's Exhibit 44 represented a single order for 1,500 units.   Under cross-examination, Mr. Williams acknowledged that 1,500 units multiplied by the purchase price per unit also did not amount to the claimed damages. Moreover, Mr. Williams ultimately testified that the 1,000 units reflected in Plaintiff's Exhibit 45 was not relevant to this dispute.   Finally, the Amended Complaint alleges lost sales of 2,800 units and 6,000 units, but Mr. Williams had no knowledge of the source of these figures.   In an attempt to derive at a number close to the proffered loss of $535,000.00, Mr. Baker testified that this number was reached by multiplying the loss of 2,800 units by the price per unit.   Mr. Baker relied entirely upon Mr. Williams as the source for the 2,800 unit RFQ.   However, as previously stated, Mr. Williams testified that he had no idea where the figure of 2,800 units had originated.   TRE failed to call any witnesses from either SPX or any automobile manufacturer to corroborate the claim that 2,800 units would have been ordered in the absence of Fieldpiece's termination of the Agreement.   Additionally, to the extent TRE had pending orders for IR leak detectors, it chose to reject Fieldpiece's unqualified offer to

have CHY fill those orders, thereby failing to mitigate its damages.

77.    When a party seeks to recover lost profits, it must establish proof with "reasonable certainty and probability that damages will result in the future to the person wronged." *ProMex, LLC*, 781 F. Supp. 2d at 1018 (quoting *Vestar Dev. II, LLC*, 249 F.3d at 958 (9th Cir. 2011) (internal quotation marks omitted)).   TRE has failed to carry this burden of proof by a preponderance of the evidence for the reasons stated herein.

### C.    Fieldpiece's Claim for Breach of Contract Against TRE

78.    In its counterclaim against TRE, Fieldpiece alleges that TRE has supplied its patented technology to third parties in violation of Fieldpiece's exclusive right to sell infrared leak detectors that include TRE's patented technology. Specifically, Fieldpiece alleges in its Counterclaim that TRE "supplied its patented technology to third parties" (Doc. 51, p. 12, ¶ 22). Fieldpiece submitted evidence at trial in an attempt to prove that TRE supplied SPX Europe and Inficon with technology covered by patents 088 and 993.   The parties agree that SPX was entitled to distribute IR leak detectors for use in the automotive market, but the Business Agreement provided Fieldpiece an exclusive license to use technology covered by patents 088 and 993 in the HVAC/R market. The burden was at all times upon Fieldpiece to prove by a preponderance of the evidence that TRE "supplied" the patented technology to these third parties for sale or distribution in the HVAC/R market in violation of the exclusivity provision of the Business Agreement.

79.    Again, to state a claim for breach of contract under California law, a party must

establish four elements: (1) the existence of a contact; (2) performance by that party; (3) breach by the other party; and (4) damage resulting from the breach. *Alcade*, 316 F. App'x at 662.

80.    The Court finds that Fieldpiece failed to prove by a preponderance of credible evidence that TRE supplied the patented technology to SPX Europe. Fieldpiece presented testimony from Mr. Harju and Mr. Ault that SPX Europe was displaying its IR leak detectors for use in the HVAC market at a trade convention in Europe and was alleged to have ordered approximately 1,100 units from CHY subsequent to TRE and Fieldpiece entering into the Business Agreement.[7]   However, TRE has failed to prove by competent evidence and by a preponderance of the evidence that the IR leak detectors displayed by SPX at the convention or the units allegedly ordered from CHY in 2011 and 2012 in fact use the technology covered by patents 088 and 993.   As discussed in Section I.D, *supra*, the PTO invalidated patent 088 in 2010 and substantially limited the claims in patent 993.   Fieldpiece chose not to present testimony from any competent source to establish that the IR detectors displayed in 2012 or ordered in 2011 and 2012 violate the exclusivity provision of the Business Agreement, and this Court will not speculate as to this critical evidentiary issue.

81.    Additionally, Fieldpiece failed to present any evidence that TRE "supplied" the

---

7. The Court notes that the testimony regarding SPX having ordered 600 units in 2011 and 500 units in 2012 from CHY is hearsay. Mr. Harju informed Mr. Williams in an email that he had obtained this information from CHY.   No business records were introduced to corroborate this hearsay statement, and the hearsay testimony of Mr. Harju is of no evidentiary value.

patented technology to SPX Europe.   Mr. Harju candidly admitted at trial that he had no evidence to suggest that TRE supplied SPX Europe with the technology.   In fact, SPX Europe ordered the IR detectors from CHY and not from TRE.   Moreover, Mr. Williams testified, and emails introduced in evidence corroborate, that TRE specifically instructed CHY not to distribute IR leak detectors for use in the HVAC/R market to SPX Europe.   Consequently, Fieldpiece has failed to present competent evidence, by a preponderance of the evidence, that TRE supplied SPX Europe with the patented technology.

82.   Turning to the issue of whether TRE supplied Inficon the patented technology, the Court finds that TRE filed suit against Inficon for allegedly infringing upon patents 088 and 993.   On October 22, 2009, TRE entered into a settlement agreement with Inficon wherein TRE granted to Inficon and all of Inficon's affiliated companies a covenant-not-to-sue with respect to patents 088 and 993. This Court has previously stated, and now finds, that the covenant-not-to-sue that TRE granted to Inficon had the effect of licensing sales of the technology. *See TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1274–77 (Fed. Cir. 2009) (holding that a settlement agreement containing a covenant-not-to-sue a patent infringer has the effect of "authorizing" or "licensing" sales by the covenantee.   Notwithstanding the fact that TRE gave Inficon a license to sell IR detection devices using technology covered by patents 088 and 993, Fieldpiece has the burden of proving by a preponderance of the evidence that the IR detectors sold by Inficon between October 22, 2009 and October 11, 2012 (the date Fieldpiece terminated the

Agreement with TRE), utilized the technology covered by patents 088 and 993.

83.     As discussed in detail in Section I.D, *supra*, Fieldpiece failed to call an expert witness qualified in the relevant discipline to testify that the Inficon IR leak detectors sold during the relevant period of time employed the technology covered by either patent 088 or 993.   As discussed herein, the PTO invalidated patent 088 and severely limited the claims set forth in patent 993. Fieldpiece admits that the Business Agreement provided them only with the exclusive right to technology covered by patents 088 and 993 and nothing more.   Accordingly, Fieldpiece had the burden to prove by a preponderance of the evidence that Inficon's IR detectors sold in the HVAC/R market used technology contained in patents 088 or 993 as those patents existed in 2006 when the Business Agreement was executed.

84.     Mr. Williams, the patent designer and owner, testified that he had not examined an Inficon IR detector since entering into the settlement agreement with Inficon in 2009. Therefore, he had no opinion as to whether the Inficon detectors used the technology set forth in patents 088 and 993 subsequent to the settlement agreement.   Moreover, Fieldpiece failed to present evidence that TRE "supplied" the patented technology to Inficon prior to and aside from issuing a license in October 2009 via the covenant-not-to-sue.   Therefore, the relevant inquiry is limited to whether Inficon used technology covered by patents 088 or 993 subsequent to October 20, 2009, the date of the license.

85.     While Fieldpiece attempted to prove TRE breached the exclusivity agreement through the testimony of Mr. Ault, the Court finds Mr. Ault's testimony to lack

credibility. Specifically, Mr. Ault is trained as a systems engineer and not an electrical engineer.   Mr. Ault examined an undetermined number of Inficon units in 2008 or 2009 and again in late 2012 or early 2013. Mr. Ault kept no notes of his examination, made no reports and took no photographs. Furthermore, Mr. Ault testified as a lay witness, and he was not disclosed as an expert by Fieldpiece.   The Court finds that Mr. Ault's assessment that the Inficon unit(s) that he dissembled in 2008 or 2009 and again in either late 2012 or early 2013 utilized TRE's patented technology is speculative and lacks credibility.[8]

86.     The evidence is also uncontroverted that TRE did not willingly supply Inficon with the IR technology prior to the settlement agreement. Otherwise, there would be no need for a patent infringement lawsuit.   Since TRE did not "supply" the technology to Inficon, even if the Court were to accept that the Inficon device used the patented technology in 2008 or 2009, that would be insufficient to find a breach of the exclusivity provision of the Business Agreement.

87.     Because the Court finds that Fieldpiece has failed to prove by competent evidence, and by a preponderance of the evidence, that TRE breached the Agreement with Fieldpiece, it has not stated a claim for breach of contract and is not entitled to an award of damages.

88.     While the Court finds that Fieldpiece has failed to prove by competent

---

8. Even if Mr. Ault had been disclosed as an expert witness, this Court would find his testimony lacking sufficient scientific methodology to warrant scrutiny.   See Fed. R. Evid. 702.

evidence, and by a preponderance of the evidence, that TRE breached the exclusivity provision of the Business Agreement as to both SPX Europe and Inficon, the Court will nonetheless address the issue of Fieldpiece's lost profits claim for completeness and clarity.  The Court incorporates by reference the legal standards for establishing lost profits set forth in paragraphs 73 and 74 of this opinion.

89.  As discussed in Section I.F, *supra*, Fieldpiece attempts to establish lost profits through the testimony of Mr. Ault.  While the Court finds that Mr. Ault is qualified due to his position within Fieldpiece to discuss his company's past sales, and even average sales, of IR leak detection devices in the HVAC/R market, the Court finds Mr. Ault is not competent to address the market share held by Inficon in the IR detector HVAC/R market between October 20, 2009 and October 11, 2012.  Mr. Ault's analysis of the potential market share enjoyed by Inficon during this period of time is predicated upon his visit to a few hundred distributors, out of a field of 4,500 distributors that sold Fieldpiece IR detection units.  Mr. Ault traveled into the field to train distributors on new Fieldpiece products and to maintain business relationships, not to conduct a statistical analysis of the Inficon IR detection market share. At best, Mr. Ault provides this Court with a rough guestimate of the volume of IR detectors sold by Inficon versus Fieldpiece.  The Court finds Mr. Ault's testimony to be speculative and legally insufficient to establish lost profits by a preponderance of the evidence.

90.  More importantly, Mr. Ault offered no testimony to suggest that Fieldpiece

could handle the market share enjoyed by Inficon, even if one were to assume that all Inficon customers would purchase IR leak detectors from Fieldpiece rather than switching to diode detectors sold by Inficon and described by Mr. Harju as nearly as good as IR detectors.   The testimony by Fieldpiece was that Inficon is the undisputed leader in the leak detection market and is substantially larger than Fieldpiece.   This being true, the Court will not simply assume that the Inficon sales of IR leak detectors, if redirected to Fieldpiece, could be filled by Fieldpiece.   By comparison, a neighborhood hardware store cannot, overnight, handle the volume of sales conducted at the local Home Depot simply because Home Depot is suddenly prevented from selling home improvement materials.

91.    The Court finds that Fieldpiece has not established by competent and credible evidence that Inficon utilized the technology contained in patents 088 or 993, as they existed in 2006, and has failed to establish the market share enjoyed by Inficon of IR detectors or that Fieldpiece could have managed to meet the needs of consumers in the event Inficon were not in the IR leak detection market.

### D.    Fieldpiece's FDUTPA Claim Against TRE

92.    Fieldpiece also asserts a claim against TRE for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Fla. Stat. Ann. §§ 501.201–.213 (West 2014). As FDUTPA is a Florida statute, Florida law controls the substantive issues under this cause of action. *Blair v. Wachovia Mortg. Corp.*, No. 5:11-cv-Oc-37TBS, 2012 WL 868878, at *2 (M.D. Fla. Mar.

14, 2012).

93.    To establish a claim under FDUTPA, a party must show: (1) a deceptive act

or unfair practice; (2) causation; and (3) actual damages. *Virgilio v. Ryland*

*Grp., Inc.*, 680 F.3d 1329, 1338 n.25 (11th Cir. 2012) (quoting *Rollins, Inc. v.*

*Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006)).

94.    FDUTPA protects "the consuming public and legitimate business enterprises

from those who engage in unfair methods of competition or unconscionable,

deceptive, or unfair acts or practices in the conduct of any trade or commerce."

Fla. Stat. Ann. § 501.202(2) (West 2014).

95.    The Florida Supreme Court has stated that "[a]n unfair practice is one that

offends established public policy and one that is immoral, unethical,

oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc.*

*v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773 (Fla. 2003) (internal quotation

marks omitted).

96.    Fieldpiece alleges in their Amended Counterclaim that TRE "supplied its

patented technology to competitors of Fieldpiece despite granting Fieldpiece

the exclusive right thereto." (Doc. 51, p. 12, ¶ 25).   As previously stated

herein, the Court finds that Fieldpiece has failed to carry its burden of proving

that TRE supplied its patented technology to competitors of Fieldpiece.

Assuming *arguendo* that Fieldpiece had met their burden of proof on this point,

the Court finds the violation of an exclusivity provision does not rise to the level

of conduct necessary to constitute a deceptive and unfair trade practice. To

hold otherwise would transform all breach of contract claims into unfair and

deceptive trade practice claims, and the Court finds the legislature did not intend to cast the net that widely in drafting FDUTPA.

97.     Fieldpiece also points to the email from Mr. Williams on November 6, 2009, as evidence of a deceptive act, wherein Mr. Williams tells Mr. Harju, "The Patent Law suit against Inficon has been settled, we retained our Patents!!   This will keep all interlopers out of the infrared product business."   (Joint Ex. 7, p. 3). The Court finds this email to be deceptive, since TRE had in fact previously entered into a covenant-not-to-sue with Inficon, thereby providing the alleged interloper access to TRE's infrared technology.   However, the Court also finds that Fieldpiece was not deceived by this representation as evidenced by Fieldpiece's repeated inquires to TRE and CHY about the royalties TRE was receiving from Inficon such that it caused Fieldpiece to suffer damages.

98.     Even if Fieldpiece had been deceived by this email, Fieldpiece has failed to prove that it was damaged by competent evidence and by a preponderance of the evidence for the reasons previously stated in this opinion.

## III.    CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.     The Clerk is **DIRECTED** to enter judgment in favor of Defendant Fieldpiece Instruments, Inc. as to Counts I and II of Plaintiff Twin Rivers Engineering Corporation's Second Amended Complaint (Doc. 38).   The Court awards costs as to Defendant Fieldpiece.

2.     The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff/Counterclaim-Defendant Twin Rivers Engineering Corporation as to the Breach of Contract

and Deceptive and Unfair Trade Practices claims brought by Defendant/Counterclaim-Plaintiff Fieldpiece (Doc. 51). The Court awards costs as to Plaintiff/Counterclaim-Defendant TRE.

**DONE AND ORDERED** in Orlando, Florida on August 11, 2014.

_____
PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies:        Counsel of Record